**Otho G. BELL, William A. Cowart and Lewie W. Griggs**

v.

**UNITED STATES.**

No. 547–56.

United States Court of Claims.

March 2, 1960.

Madden, J., dissented.

Robert E. Hannon, Castro Valley, Cal., for plaintiffs.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant. Sheldon J. Wolfe, Washington, D. C., was on the brief.

JONES, Chief Judge.

The plaintiffs sue for pay and allowances which they claim to be due them as prisoners of war from the dates of capture in 1950 and 1951 until their discharge from the Army on January 23, 1954.

They had enlisted in the United States Army at different dates in 1949. At the time of their capture they were privates, first class.

The applicable statutes are set out in the footnote.[1] The plaintiffs claim that

---

1. 50 U.S.C.A.Appendix, § 1002 provides as follows:

"Any person who is in active service and who is officially determined to be absent in a status of missing, missing in action, interned in a foreign country, captured by a hostile force, beleagured or beseiged shall, for the period he is officially carried or determined to be in any such status, be entitled to receive or to have credited to his account the same pay and allowances to which he was entitled at the beginning of such period of absence or may become entitled thereafter, and entitlement to pay and allowances shall terminate upon the date of receipt by the de-

partment concerned of evidence that the person is dead or upon the date of death prescribed or determined under provisions of section 5 of this Act [section 1005 of this Appendix]: *Provided*, That such entitlement to pay and allowances shall not terminate upon expiration of term of service during absence and in case of death during absence shall not terminate earlier than the dates herein prescribed: *Provided further*, That there shall be no entitlement to pay and allowances for any period during which such person may be officially determined absent from his post of duty without authority and he shall be indebted to the Government for any pay-

from the date of their capture until their actual discharge they were entitled under the statutes to the regular pay and allowances of soldiers of their classification.

The defendant alleges in the pleadings and it is not denied by the plaintiffs that they were among prisoners who were captured; that these three refused to be repatriated and return to the United

ments from amounts credited to his account for such period."

50 U.S.C.A.Appendix, § 1006 provides as follows:

"When it is officially reported by the head of the department concerned that a person missing under the conditions specified in section 2 of this Act [section 1002 of this Appendix] is alive and in the hands of a hostile force or is interned in a foreign country, the payments authorized by section 3 of this Act [section 1003 of this Appendix] are, subject to the provisions of section 2 of this Act [section 1002 of this Appendix], authorized to be made for a period not to extend beyond the date of the receipt by the head of the department concerned of evidence that the missing person is dead or has returned to the controllable jurisdiction of the department concerned. When a person missing or missing in action is continued in a missing status under section 5 of this Act [section 1005 of this Appendix], such person shall continue to be entitled to have pay and allowances credited as provided in section 2 of this Act [section 1002 of this Appendix] and payments of allotments, as provided in section 3 of this Act [section 1003 of this Appendix], are authorized to be continued, increased, or initiated."

50 U.S.C.A.Appendix § 1009 provides as follows:

"The head of the department concerned, or such subordinate as he may designate, shall have authority to make all determination necessary in the administration of this Act [sections 1001–1012 and 1013–1016 of this Appendix], and for the purposes of this Act [said sections] determinations so made shall be conclusive as to death or finding of death, as to any other status dealt with by this Act [said sections], and as to any essential date including that upon which evidence or information is received in such department or by the head thereof. The determination of the head of the department concerned, or of such subordinate as he may designate, shall be conclusive as to whether information received concerning any person is to be construed and acted upon as an official report of death. When any information deemed to establish conclusively the death of any person is received in the department concerned, action shall be taken thereon as an

official report of death, notwithstanding any prior action relating to death or other status of such person. If the twelve months' absence prescribed in section 5 of this Act [section 1005 of this Appendix] has expired, a finding of death shall be made whenever information received, or a lapse of time without information, shall be deemed to establish a reasonable presumption that any person in a missing or other status is no longer alive. Payment or settlement of an account made pursuant to a report, determination, or finding of death shall not be recovered or reopened by reason of a subsequent report or determination which fixes a date of death except that an account shall be reopened and settled upon the basis of any date of death so fixed which is later than that used as a basis for prior settlement. Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under provisions of this Act [sections 1001–1012 and 1013–1016 of this Appendix], to pay and allowances, including credits and charges in his account, and all such determinations shall be conclusive: *Provided*, That no such account shall be charged or debited with any amount that any person in the hands of a hostile force may receive or be entitled to receive from, or have placed to his credit by, such hostile force as pay, wages, allowances, or other compensation: *Provided further*, That where the account of any person has been charged or debited with allotments paid pursuant to this Act [said sections] any amount so charged or debited shall be recredited to such person's account in any case in which it is determined by the head of the department concerned, or such subordinate as he may designate, that payment of such amount was induced by fraud or misrepresentation to which such person was not a party. When circumstances warrant reconsideration of any determination authorized to be made by this Act [said sections] the head of the department concerned, or such subordinate as he may designate, may change or modify a previous determination. Excepting allotments for unearned insurance premiums, any allotments paid from pay and allowances of any person for the period of the per-

States when they were released from prison; that instead they chose to remain with the Communists and in a communist country; that between the time of the plaintiffs' capture and the time of their dishonorable discharge each plaintiff adhered to, worked for, and collaborated with the enemy of the United States; that since they refused repatriation when they were released from prison and since they continued in their election until January 23, 1954, they were on that date dishonorably discharged from the Army.

These allegations are nowhere disputed.

The defendant asserts that because of these admitted facts the plaintiffs were guilty of a breach of the contracts of enlistment and of their oaths of faithful service; and that therefore each plaintiff abandoned his status as a soldier in the United States Army and forfeited all pay and allowances to which he might have been entitled otherwise.

The undisputed testimony shows that during the period of their confinement each of the three plaintiffs became moni-

tors for the "forced study groups," the sessions of which the prisoners were compelled to attend. Armed guards attended these sessions. The programs included lectures picturing what were declared to be the bad aspects of life in the United States as contrasted with idyllic life under communism. As monitors, they procured and distributed propaganda literature, and threatened to turn in names of any prisoners who refused to read and discuss favorably these propaganda handouts.

Each of the plaintiffs made tape recordings which were used as broadcasts and over the camp public address system. Each of them wore Chinese uniforms and were permitted to attend meetings outside the camp. The details of the plaintiffs' consorting, fraternizing and cooperating with their captors and the devious ways in which they sought favors for themselves, thus causing hardship and suffering to the other prisoners, are set out in our findings 7 to 30, inclusive.

Two of Bell's recordings were broadcast over the Peiping radio, stating

son's entitlement under the provisions of section 2 of this Act [section 1002 of this Appendix] to receive or have credited such pay and allowances shall not be subject to collection from the allottee as overpayments when payment thereof has been occasioned by delay in receipt of evidence of death, and any allotment payments for periods subsequent to the termination, under this Act [sections 1001–1012 and 1013–1016 of this Appendix] or otherwise, of entitlement to pay and allowances, the payment of which has been occasioned by delay in receipt of evidence of death, shall not be subject to collection from the allottee or charged against the pay of the deceased person. The head of the department concerned, or such subordinate as he may designate, may waive the recovery of erroneous payments or overpayments of allotments to dependents when recovery is deemed to be against equity and good conscience. In the settlement of the accounts of any disbursing officer credit shall be allowed for any erroneous payment or overpayment made by him in carrying out the provisions of this Act [sections 1001–1012 and 1013–1016 of

this Appendix], except sections 13, 16, 17, and 18 [sections 1013 and 1016, and former sections 1017, 1018 of this Appendix], in the absence of fraud or criminality on the part of the disbursing officer involved, and no recovery shall be made from any officer or employee authorizing any payment under such provisions in the absence of fraud or criminality on his part."

10 U.S.C. § 846 (1952) provides as follows:

"Every noncommissioned officer and private of the Regular Army, and every officer, noncommissioned officer, and private of any militia or volunteer corps in the service of the United States who is captured by the enemy, shall be entitled to receive during his captivity, notwithstanding the expiration of his term of service, the same pay, subsistence, and allowance to which he may be entitled while in the actual service of the United States; but this provision shall not be construed to entitle any prisoner of war of such militia corps to any pay or compensation after the date of his parole, except the traveling expenses allowed by law. (R.S. § 1288.)" Now 37 U.S.C.A. § 242.

among other things that on the orders of his platoon leader, his men had killed North Korean prisoners of war, and that President Truman was a warmonger. In written articles for the camp newspaper he alleged that American troops had committed atrocities and he personally had been ordered to kill women and children and not to take prisoners of war, and that if given the opportunity he would run a tank over the President's body.

Bell was paid money to write these articles. He also delivered lectures before his company and to the camp on American aggression. He appeared voluntarily in a motion picture and appeared in bimonthly plays. He stated that if given a weapon he would fight against the United States. He sold food intended for the sick to other prisoners of war. By making reports to the Chinese, he caused one man to be bayonetted and others to be placed in solitary confinement.

Cowart did many similar things, wrote propaganda articles accusing American soldiers of atrocities and of using germ warfare. He drew posters and cartoons for the enemy, acted in plays, walked and talked with the Chinese officers, guards and interpreters, lived part of the time at Chinese regimental headquarters, stated he hated America, desired to study in China and to return to the United States in five years to help in the overthrow of the government.

Griggs did many similar things, attended enemy parties, visited Chinese headquarters frequently, referred to the Chinese as comrades, was accorded special privileges, made broadcasts, signed leaflets, wrote articles accusing the American soldiers of atrocities and declared the United States had used germ warfare.

These and many other acts of perfidy are abundantly proved by the record and are nowhere denied either in the pleadings or in the evidence. The record does not disclose any suggestion whatever of brainwashing. As a matter of fact, the record justifies the conclusion that at all times these men did these acts voluntarily for the purpose of helping themselves, in complete disregard of the effect it might have on the treatment of their fellow prisoners. The record does not indicate a touch of loyalty either to their compatriots or to their country after the period they were taken prisoners of war.

The defendant produced at the trials as witnesses certain Army staff officers who testified authoritatively that the United States did not authorize the use of germ warfare in Korea, did not ship any materials or equipment to Korea for that purpose, and received no requests for such materials or equipment. Rather than have this testimony remain in the record as evidence, the plaintiffs' counsel stipulated that neither the United States nor any of the United Nations forces engaged in germ warfare in Korea. In view of this stipulation and concession, the commissioner sustained plaintiffs' objection to this part of defendant's testimony but permitted it to remain in the record as defendant's offer of proof under Rule 41(c), 28 U.S.C.

In reference to plaintiff Bell's statement, as shown in finding 14, that the American troops had injected poison gas into the blood of communist prisoners of war on a ship, plaintiffs' counsel stipulated at the trial that this had not been done.

After the Korean armistice, which was signed July 27, 1953, and prisoner repatriation had begun on August 5, 1953, each of the plaintiffs refused repatriation and voluntarily elected to go to Communist China. After the plaintiffs were discharged on January 23, 1954, they filed this suit for their pay during the period indicated.

R.S. 1288, 10 U.S.C. § 846, supra, was enacted in 1814. Numerous statutes have been enacted and committee reports made since that time. These latter statutes, including sections 1002, 1006, and 1009, supra, of the legislation entitled the Missing Persons Act, as amended, cover the cases here presented. In fact, not only the language of the acts themselves, but the committee reports at the time these sections were enacted clearly show

that but for this Missing Persons Act there would be no basis of a claim for compensation.[2]

It will be noted that section 1002, as quoted in the footnote, states in effect that any person determined to be "interned in a foreign country, captured by a hostile force, beleaguered or besieged shall, for the period he is officially carried or determined to be in any *such status,* be entitled" to pay and allowances. (Emphasis supplied.) Section 1006 states in effect that when it is officially reported that a person missing under the conditions specified is alive and *in the hands of a hostile force or is interned in a foreign country* he shall be paid.

Section 1009, which is a part of the same Act, states that "the head of the department concerned, or such subordinate as he may designate, shall have authority to make all determinations necessary in the administration of this Act, and for the purposes of this Act determinations so made shall be conclusive as to death or finding of death, as to any other status dealt with by this Act * * *. Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under provisions of this Act, to pay and allowances * * *. When circumstances warrant reconsideration of any determination authorized to be made of this Act the head of the department concerned, or such subordinate as he may designate, *may change or modify a previous determination."* (Emphasis supplied.)

This modification in the language of the law completely changes the original act, which was unconditional. These changes in the original act leave not the slightest doubt that it was the intention of the Congress to authorize the head of the department or his agent to determine not only the status but the entitlement to pay.

It is inconceivable that the plaintiffs should be paid in the circumstances disclosed by the undisputed facts in this record. The fact is that essentially they were not confined. They were permitted to go outside the camp, were given practical freedom and in the essence of things they were no longer in the status of prisoners.

The Department, in denying plaintiffs' claims, which were filed with the Department for pay, necessarily determined under the provisions and authority of the statute just quoted that during the period involved these plaintiffs did not have a status as prisoners, and were not entitled to pay under the quoted statutes. It was determined under the provisions of section 1009, quoted above, that they were not entitled to their pay. Such a finding was implicit in a determination that they should not be paid for the period following capture. This determination is fully supported by the record made here.[3]

It is almost incredible that these men would ask for pay in light of the conduct disclosed by the record.

■ In arriving at the intent of the Congress, it is necessary to construe all the provisions of the law together even if sometimes it seems not to be in strict accord with certain specific provisions when they are lifted from the body of the law and read out of context. Luna v. United States, 1952, 108 F.Supp. 510, 124

2. See committee report, U.S.Cong. & Adm. News, 83d Cong., 1st Sess., 1953, p. 1344.

3. The Army in denying payment of plaintiffs' claims stated in part as follows:
   "I have been advised that the following determinations have been made regarding the status of all United States Army Voluntary Non-Repatriates who elected not to accept repatriation to United States control under the terms of the Korean Armistice Agreement prior to 23 January 1954:

   "a. That all Voluntary Non-Repatriates who refused to elect repatriation prior to 23 January 1954, under the terms of the Korean Armistice Agreement have, as demonstrated by their refusal to elect repatriation to the United States and their records as prisoners of war, adopted, adhered to or supported the aims of Communism, one of which is the overthrow of all non-Communist governments, including the Government of the United States, by force or violence."

Ct.Cl. 52; Olney v. United States, 1952, 105 F.Supp. 1005, 123 Ct.Cl. 285, certiorari denied 344 U.S. 898, 73 S.Ct. 275, 97 L.Ed. 694; United States v. Kirby, 1868, 74 U.S. 482, 19 L.Ed. 278; and Heydenfeldt v. Daney Gold & Silver Min. Co., 1876, 93 U.S. 634, at page 638, 23 L.Ed. 995, from which we quote the following:

> "It is true that there are words of present grant in this law; but, in construing it, *we are not to look at any single phrase in it, but to its whole scope,* in order to arrive at the intention of the makers of it. * * * If a literal interpretation of any part of it would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected. There is no better way of discovering its true meaning, when expressions in it are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced its enactment." (Emphasis supplied.)

The Kirby case involved an indictment of a sheriff and his posse under a statute which prohibited a willful obstruction of the United States mails. The sheriff had arrested a mail carrier who had been indicted for murder. In holding the statute not applicable, the Supreme Court, 74 U.S. at page 487, made the following statement:

> "The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—'for he is not to be hanged because he would not stay to be burnt.' And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder."

The defendant urges numerous defenses, including the claim that the statute which provided for pay "during captivity" is inapplicable because the plaintiffs were not really in captivity.

The Army regulations promulgated under the Missing Persons Act and in force at the time provide that the determination of the head of the Department, or his designated subordinate, as to status and as to entitlement to pay and allowances under this Act shall be conclusive. A.R. 35–1325, dated July 15, 1953.

We held in the case of Moreno v. United States, 1950, 93 F.Supp. 607, 118 Ct. Cl. 30, certiorari denied 342 U.S. 814, 72 S.Ct. 29, 96 L.Ed. 616, that under the provisions of section 1009, supra, of the Missing Persons Act, the Department head was authorized to conclusively determine both the status and entitlement to pay under the Act.

To adopt the construction for which plaintiffs contend would lead the entire purpose of the law into an absurdity.

The plaintiffs admit that they gave aid and comfort to the enemy. The pleadings and stipulations establish that fact. They made it far more difficult for their compatriots who were there with them. They made tape recordings to be used for encouraging the enemy and for discouraging the people of their own country. One of them took pay for these admitted acts. The others were paid in various privileges and advantages. Who can say that these broadcasts and other acts did not cause loss of life in the struggle? Certainly it added to the hardships and suffering of their compatriots. The proof of these acts is overwhelming in the record. They were denied neither in the pleadings nor in the evidence.

For the purposes of a suit for civilian pay these facts are abundantly proven. For penalty or punishment purposes a trial by a court martial or for treason is perhaps necessary, but this is a civil court in which plaintiffs must establish their rights to affirmatively recover. In the face of these admitted facts the showing of a right to recovery fails. Neither the light of reason nor the logic of analysis of the undisputed facts of record can possibly justify the granting of a judgment favorable to these plaintiffs.

Plaintiffs start up a difficult mountain to a summit of sheer legalism. Somewhere amid the mists and clouds along the way the spirit of the law completely disappears and its broken body lies in an unmarked spot under an avalanche of technical snow.

We cannot believe that any law can be as cold and lifeless as that. The law has for its primary purpose the ends of justice; otherwise it is as useless as a child trying to grasp a handful of sunlight. The law is a living thing, is not an end in itself but a means to an end. If it fails in this one thing it fails in everything.

To allow recovery in these cases would be to put a premium on dishonor and a penalty on courageous loyalty. We do not see how this court, or any court, can construe the law in such a fashion.

During the period involved here the defendant made certain payments for insurance and dependents. These were made largely for the benefit of the dependents of these soldiers and were not paid directly to the soldiers. The dependents in this record are not shown to have had any part in the actions of these unfortunate soldiers during the period involved here and are not parties to this suit. We do not believe that the ends of justice would be served by granting a judgment for the Government on its counterclaims.

The plaintiffs' petition and the defendant's counterclaims are dismissed in each of the cases.

It is so ordered.

LARAMORE and WHITAKER, Judges, concur.

MADDEN, Judge (dissenting).

The statutes upon which the plaintiffs found their claims are 50 U.S.C.A.Appendix § 1002 and 10 U.S.C. (1952 ed.) § 846. The former statute says:

"Any person who is in active service and who is officially determined to be absent in a status of missing, missing in action, interned in a foreign country, captured by a hostile force, beleaguered or besieged shall, for the period he is officially carried or determined to be in any such status, be entitled to receive or to have credited to his account the same pay and allowances to which he was entitled at the beginning of such period of absence * * *."

The second statute cited above is to the same effect.

The plaintiffs, soldiers in the Korean War, were captured by North Korean or Chinese communist forces, two of them in 1950 and the third in 1951, and were prisoners until August 5, 1953, at which time the repatriation of prisoners following the Armistice began. The plaintiffs refused repatriation to the United States and elected to go to communist China. All three were dishonorably discharged from the Army on January 23, 1954. All three returned to the United States in July, 1955.

The plaintiffs have not been paid for the periods between the dates of their capture by the enemy and the date of their release from prison They sue for that pay and point to the statutes. The statutes seem to say that they are entitled to their pay.

The Government says the statute should not be read as entitling them to their pay because the Army and this court have found as a fact that their conduct, while prisoners of war, was traitorous and contemptible.

No sophisticated person needs be told that there is much that a court can do with the literal language of a statute in order to avoid an absurd result or to produce a just result or one consistent with an important policy. But the judicial rewriting of statutes ought to be indulged in with reluctance, and only when it is reasonably certain that the process will not do more harm than good, will not confuse the law rather than enlighten it.

The court, by adopting the Government's argument, has in effect placed in the disbursing officers of the Government the function of amending the statutes fixing the pay of military or civilian personnel on a *quantum meruit* basis. Both the military and civilian branches of Government service have their quotas of dead wood, and their quotas of persons of extraordinary value to the Government. Presumably, the paymasters may not pay the latter persons more than the statutes permit, but under today's decision it would seem that they may pay the former persons only what they are worth, which would be well below the statutory scale.

It will be said, of course, and truthfully said, that the conduct of the plaintiffs as prisoners of war was indecent and reprehensible. The Government says that they must not be "rewarded" for such conduct by getting the pay which the statutes provide for prisoners of war. There has never been a war in which some prisoners have not acted contemptibly, in comparison with the conduct of their better balanced comrades. In modern warfare, with its subtle brainwashing techniques, one of the perils to badly balanced youths is the peril of being taken prisoner, of being persuaded to disloyal conduct, and of coming out of prison with their lives irreparably ruined. The amounts of pay here sued for by these plaintiffs would be a fabulous reward, indeed, for the tragic thing that happened to them in prison.

The statutes provide for the trial and punishment of soldiers for misconduct. If these men had been subjected to trial by a court-martial, or by a civilian court, the court would have considered their age, their upbringing, their mental qualities, the nature of the pressures to which they were exposed, and would have rendered an appropriate judgment. The judgment would not have included forfeiture of accrued pay. The Uniform Code of Military Justice, effective May 5, 1950, 64 Stat. 126, 50 U.S.C. § 638,* provides that no forfeiture of pay and allowances shall extend to any pay or allowances accrued before the date when a court-martial sentence is approved by the convening authority.

It is noteworthy that after Congress abolished the historical power of courts-martial to forfeit accrued pay, the Army, apparently for the first time in history, forfeited the pay already accrued to these plaintiffs, not by the process of trial and sentence, which was forbidden by statute, but by the crude and primitive method of refusing to give them their money. Finding nothing in the law books to justify its refusal to pay these men, it threw the books away and just refused to pay them. It could have set before these confused young men a better example of government by law.

Congress has never been willing to venture into the field of distinguishing, in its pay schedules between good soldiers and bad soldiers, or between bad soldiers and soldiers so bad that they are beneath contempt. I venture to predict that it will never do so, because the task would be impossible.

The plaintiffs have incurred the just condemnation of public opinion. The courts have nothing to do with that judgment. In court they are entitled to judgment according to law. I think that, according to law, they are entitled to their pay.

* Now 10 U.S.C.A. § 857.

## Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiffs, Otho G. Bell, William A. Cowart, and Lewie W. Griggs, were citizens of the United States at the time of their enlistments in the United States Army, and there is no evidence that their status as such has changed.

2. The plaintiffs, Bell, Cowart, and Griggs, enlisted in the United States Army on the respective dates of January 29, 1949, January 7, 1949, and August 4, 1949.

3. The plaintiffs, Bell, Cowart, and Griggs, were captured by the North Korean and/or Chinese communist forces in Korea, along with other United States soldiers, on the respective dates of November 30, 1950, July 12, 1950, and April 25, 1951.

4. At the times of their capture as aforesaid the plaintiffs were privates first class in the United States Army.

5. Upon their capture as aforesaid the plaintiffs Bell and Griggs, were detained, respectively, in Prisoner of War Camp No. 5 located at Pyoktong, North Korea, and in Prisoner of War Camp No. 1. The record does not disclose the place of detention of the plaintiff Cowart.

### Activities of Plaintiffs During Detention

6. The parties by their attorneys entered into a stipulation of record by the terms of which, for the purposes of this proceeding, certain facts were to be deemed to have been elicited from defendant's witnesses testifying under oath, without the necessity of calling such witnesses to trial. The plaintiffs did not rebut the facts so elicited and waived the right to testify or to call witnesses to testify in rebuttal of the said facts, although the plaintiffs did reserve the right to object to the materiality and relevancy of any of the facts. The facts so set forth in the stipulation related to the activities of the plaintiffs while they were detained as prisoners of war, and (as slightly modified) are provided in detail as to each plaintiff in succeeding findings 7 through 30.

### Otho G. Bell

7. During his confinement by enemy forces as aforesaid plaintiff Bell voluntarily served as a monitor in required squad study group meetings organized by the Chinese, beginning about January 1, 1951. These were also known as "forced study groups", which POW's were forced to attend under threat of duress. Armed guards were present at these sessions. The programs consisted of lectures depicting the derogatory aspects of life in the United States, and extolling the idyllic aspects of life under communism. As squad monitor, Bell procured communist propaganda literature from the enemy, distributed said writings among the squad members, and instructed them to read and discuss this literature. He threatened to turn in the names of any prisoners of war who refused to read or discuss favorably these communist propaganda handouts. In these forced attendance study group meetings he also lectured and led the discussions favorable to the communist cause and condemnatory of the United States, e. g., stating that the United States engaged in germ warfare, that the United States had caused the Korean war, that American forces had committed atrocities, that there were many more advantages about communism than about democracy. He voluntarily attended the special Voluntary Study Group maintained by the Chinese to indoctrinate the so-called "progressives", a term meaning POW's who consorted, fraternized and cooperated with their captors. He voluntarily joined the Peace Committee, whose members espoused communism through public address system broadcasts, and through distribution of propaganda articles and petitions.

8. Plaintiff Bell made tape recordings which were then broadcast over the Peiping radio and over the prison camp's public address system. He stated that the Chinese treatment of the prisoners of

war was good, requested that his parents and relatives write President Truman to end the war and withdraw the Seventh Fleet from Formosa, said that the Korean war was senseless, avowed that on the orders of his platoon leader, his men killed North Korean prisoners of war, vilified President Truman as a warmonger, averred that life was better in China than in the United States, declared the American political parties were led by imperialists.

9. Plaintiff Bell participated in numerous communist propaganda activities. He wrote articles which appeared in the camp newspaper, *Towards Truth And Peace*, and in magazines entitled, *People's China*, and *China Monthly Review*. In these articles plaintiff alleged that American troops had committed atrocities against North Korean civilians and enemy soldiers and that he personally had been ordered to kill women and children and not to take prisoners. He ridiculed the American Army. He praised the good treatment accorded the prisoners of war by the Chinese. He wrote that the United States was unjustified in sending troops to Korea, and that he wanted to go to China to fight for peace and did not want to return to America. He urged the prisoners of war to vow to fight for world peace on their return to the United States. He accused President Truman of forcing the United States into war and said that if given the opportunity he would run a tank over the President's body. Plaintiff Bell was paid money to write these articles. With the money he was paid to write these articles, he purchased candy and cigarettes in the Chinese Post Exchange in Pyoktong.

10. Plaintiff Bell was a member of the so-called "Wall Paper Committee" whose duties were to hang enemy propaganda articles, pictures, cartoons and slogans on the camp bulletin board. He delivered lectures before his company and to the camp upon American aggression, and belittled America's economic and educational systems. He wrote letters to the United Nations in which he declared that American troops had committed atrocities against enemy civilians and soldiers, and that prisoners of war were receiving good treatment from their captors.

11. Plaintiff Bell drew cartoons and posters depicting American atrocities and use of germ warfare, which were pinned upon the camp bulletin boards and printed in the above-named publications. He drew up and signed peace petitions addressed to President Truman, the United Nations, to relatives of prisoners of war, and to peace organizations, e. g., Stockholm Peace Appeal, the Vienna Peace Conference, and the Asia and Pacific Peace Conference. Further, the Chinese made motion pictures of plaintiff as he signed the petition addressed to the Asia and Pacific Peace Conference. He led a group of so-called progressives in camp carrying banners depicting President Truman as a clown and slogans reading "Down with capitalists". Plaintiff Bell appeared in bimonthly plays—one entitled "Golden Boy" depicting poverty and racial discrimination in the United States, and the other which he wrote was entitled "The Highest Stage of Capitalism" concerning the overthrow of the United States. He appeared voluntarily in a Chinese motion picture in which he portrayed an American rifleman captured by the communists. The motion picture depicted atrocities committed by American soldiers and the low morale of the American forces. He also signed surrender leaflets. He attempted to persuade and/or persuaded other prisoners of war to join the Voluntary Study Group and the Peace Committee. He also tried to persuade and/or persuaded other POW's to sign petitions, to follow and accept communistic theories, and to make recordings.

12. Plaintiff Bell made the following statements—that for every good point about the American Government, there were three good things about communism, that the South Koreans started the war and that it was like the Civil War in the United States, that American troops were tools and hatchet-men of

American imperialists, that the United States and the United Nations had no right to be in the war, that the United States engaged in germ warfare, that if he were given a weapon he would fight against the United States and that he had attempted to join the Chinese Army but had been refused, that he would return from China in five years and would teach communism and help fight for communism, that the working people are slaves and cannon fodder for the capitalists, that he was not going to return to the United States and planned to renounce his citizenship and stay in China to fight for the peoples' side.

13. Plaintiff Bell wore the Chinese uniform, plus the Peace Dove Medal (given by the Chinese to show that the wearer was in sympathy with communism) and the Mao Tse Tsung medal (given by the Chinese to so-called "progressives") to identify them as communists and to reward them for their achievements and learning in communistic ideology. He consorted with the Chinese. He attended enemy parties held in Pyoktong. He visited the Chinese company and regimental headquarters in the prison camp frequently, in the day and at night. He took walks and talked with Chinese officers, inside and outside the camp. He was accorded special privileges by the Chinese, e. g., more and better food and drink, better medical treatment, freedom of the camp, lighter work details.

14. As squad leader in Camp No. 5, he sold food intended for the sick to other POW's at $5 a bowl. As monitor of the forced study group, he had food rations for some men cut down because they would not favorably discuss communism, and threatened to turn in the names of men who did not study the communistic literature. He informed on other POW's. As monitor of the forced study group, he would inform the Chinese if a squad member refused to read required propaganda literature, or failed to voice a procommunist opinion in the discussion periods. He told the Chinese that a certain POW was planning to escape and, as a result, the POW was placed in solitary confinement. He told the Chinese that he and others in his outfit had killed Chinese POW's and this falsification caused the Chinese to attempt to pressure another POW into writing a story about these atrocities. He told the Chinese that the 2d Infantry Division massacred South Korean civilians. A United States POW was interrogated as a result of plaintiff's written statement to the Chinese that American troops herded communist POW's on a ship and injected poison gas into their blood, that the American Air Force bombed women and children, and that he saw an American lieutenant and enlisted men rape a Korean woman.

15. Plaintiff Bell turned in names to the Chinese of POW's whom he had ordered to obtain their rations, but who had been too ill to obey. He reported a POW who had refused to fall out for exercise, who was therefore sentenced to 15 days at hard labor with his rations cut to one meal a day. He informed on POW's who stole wood from the Chinese. He also informed the Chinese that POW's had stolen food for which acts they were put into solitary confinement. As a result of plaintiff's relation to the Chinese, a POW had a fight with another POW and one of them was placed in solitary. Because he reported to the Chinese that certain POW's had criticized him, these POW's were made to stand outdoors in the sun all day and were sentenced to hard labor. He reported to the Chinese the name of a POW who planned to escape, and the latter was placed in "the hole" [4] where he died. Because he gave the names to the Chinese of POW's who participated in a sit-down strike, one of the men was bayonetted and the rest were placed in solitary. A POW was forced to stand in an icy river because

4. The "hole" was a damp hole in the earth of dimensions which did not permit the occupant to stand, sit, or lie down. It was covered by a tin roof and lacked sanitation facilities.

plaintiff told the Chinese that the former had "talked back" to him.

16. The Korean armistice was signed July 27, 1953, and prisoner repatriation began August 5, 1953, at Panmunjon. Plaintiff Bell refused repatriation and voluntarily elected to go to communist China. After going to communist China, he attended the Ideological Reformation School in Taiyuan, China, where communist ideology was taught, for seven months. He was assigned to a machine center on a collective farm in the Yellow River Valley, China, where he worked until his return to the United States. On January 23, 1954, plaintiff Bell was dishonorably discharged from the United States Army. He returned to the United States in July 1955.

### William A. Cowart

17. During his confinement by enemy forces as aforesaid plaintiff Cowart stole food from other POW's in the North Korean prison camps. He visited the headquarters of the North Korean forces frequently, and conversed with Korean officers and Russian civilians there. He told the North Korean captors that two fellow POW's had beaten him for stealing their food. He informed a North Korean colonel that the POW's had disobeyed orders by giving prisoners too ill to work full rations rather than half rations. He informed North Korean captors that a POW had stolen foodstuffs and that a POW was planning to escape. He signed a petition calling on the United Nations forces to lay down their arms. He received extra tobacco rations from the North Korean guards and was given light work details.

18. Subsequent to October 19, 1951, plaintiff Cowart was transferred to Chinese Prisoner of War Camp No. 3. He was a monitor of the forced study group there, and was a member of the Voluntary Study Group attended by all so-called "progressives" for the purpose of communistic indoctrination. He influenced or attempted to influence other POW's to join the Voluntary Study Group and to believe in the communistic dogma. He made tape recordings which were later broadcast over Peiping radio and over the camp public address system. He therein broadcast about the good treatment accorded to POW's by the Chinese. He urged that America end the war and the American Government be petitioned to end the war. He declared that the Korean war was useless, that American soldiers were being cheated by the capitalists and warmongers of Wall Street, and that America should cooperate with the Chinese.

19. Plaintiff Cowart was a member of the Peace Committee which drew up, signed and circulated peace petitions. He wrote propaganda articles which appeared in *Towards Truth And Peace* and in the *China Monthly Review*. He wrote that American soldiers committed atrocities, that Americans used germ warfare, that the Chinese had a better educational system than the United States in that in America only the wealthy could obtain an education, that the United States used germ warfare, that the American people had been misled and that the United States was waging an aggressive war. He reviewed the communist books he had read. He drew propaganda posters and cartoons, depicting capitalists living off the masses, Uncle Sam hanging from a tree or lying in a coffin with the words written "For Peace and Against American Aggression" and "Down With War Mongers", depicting Uncle Sam carrying a bomb, and Uncle Sam on his knees before a Chinese soldier armed with a bayonet.

20. Plaintiff Cowart acted in several camp plays. One play mocked the various United Nations. Other plays depicted that the use of a germ warfare bomb and the use of an atomic bomb benefited capitalists, that civilians were being coerced to join the American Army. In another play, he portrayed an American POW who was being treated well by the Chinese while other American soldiers were stupidly fighting in foxholes. Another play satirized President Truman and General Ridgway, at the end of which

the actors, including Cowart, said "Down With the United States."

21. Plaintiff Cowart wore a Chinese uniform, the Peace Dove Medal and the Stalin Badge. He informed on POW infractions or actions, for which they were later punished. He reported to the Chinese that POW's had stolen food from the Chinese warehouse, that certain POW's made anti-communist remarks, that he (Cowart) had been beaten by POW's, that certain POW's were either not studying the propaganda given to them or were not giving the correct answers in the forced study group meetings, that a POW was planning to escape, that certain POW's had torn up slogans and pictures in the progressives' Study Club Room.

22. Plaintiff Cowart consorted with the Chinese running the prisoner of war camp, attended Chinese parties, walked and talked with Chinese officers, guards and interpreters, and lived for some time at the Chinese regimental headquarters. He was given special privileges, e. g., better rations, quarters, no work details, and was allowed to make purchases at the Chinese Post Exchange in Pyongyang.

23. Plaintiff Cowart stated that he believed in communism that any thinking person would adopt communism, that he hated America, that its Government should be overthrown, that he desired to study in China and return to the United States in five years to help in the overthrow of the Government, which was inevitable, that the American Government was fascistic, similar to the German Government. He wrote a letter to Mao Tse Tsung in which he stated his belief in communism, criticized the American economic and educational systems, asked for the opportunity to study in China and join the communist party, and gave thanks for the kind treatment accorded him by the Chinese.

24. The Korean armistice was signed July 27, 1953, and prisoner repatriation began August 5, 1953, at Panmunjon. Plaintiff Cowart refused repatriation and voluntarily elected to go to communist China. After going to communist China he voluntarily attended a communist indoctrination school at Taiyuan, China, where communist ideology was taught, for seven months. On January 23, 1954, plaintiff Cowart was dishonorably discharged from the United States Army. In July 1955, he returned to the United States.

### Lewie W. Griggs

25. During his confinement by enemy forces as aforesaid plaintiff Griggs was a monitor in the forced study group meetings in the prisoner of war camp wherein he led the discussions after he had lectured on communism. He was also a member of the Voluntary Study Group which he attended regularly with other so-called "progressives". He was a member of the Peace Committee which drew up, signed and circulated peace petitions. He attempted to influence and persuade POW's to join the Voluntary Study Group and Peace Committee, to sign petitions, and to follow communistic doctrines. He wore a Peace Dove Medal, and also wore a black arm band at Stalin's death. As a member of the Permanent Peace Committee he wore a cloth inscribed with Chinese writing on his chest.

26. Plaintiff Griggs was a member of a Kangaroo Court invoking punishment on POW's for infractors. He appeared as a witness against a POW and signed his name to the charges. A POW, after being released from a cellar by the Chinese, was returned to the cellar at the suggestion of the Peace Committee on which plaintiff Griggs served. He recommended to the Chinese various punishments to be meted out to POW's for breaking rules, while other squad members stated that nothing should be done. He informed on POW's. He revealed names to the Chinese of POW's who led a mass exodus from a communist entertainment show. He disclosed to the Chinese the name of a POW who had planned to escape. As monitor, he disclosed the names of those who criticized communism or refused to study communistic literature, and revealed the names of

POW's who had stolen food and tobacco from the Chinese warehouse.

27. Plaintiff Griggs made recordings for the Chinese radio, which were also sent out over the camp public address system. Roundtable discussions of the so-called "progressives", in which plaintiff participated, were recorded and broadcast. He spoke over the camp public address system. The subjects of these recordings and broadcasts were, that atrocities had been committed by American troops, that the American Government should be overthrown, that the Korean war was the fault of the United States. One of the recordings, which was directed to plaintiff's mother and played back over the public address system, requested that his mother join organizations for peace and persuade President Truman to withdraw troops from Korea. As a member of the Peace Committee, he drew up, signed and circulated peace petitions which urged the cessation of war and the use of bombs and germ warfare by the United States. He signed surrender leaflets and letters addressed to his friends which were dropped behind United Nations lines. These letters and leaflets urged surrender and described the good treatment provided by the Chinese.

28. Plaintiff Griggs wrote propaganda articles to which he signed his own name or unauthorizedly signed the name of another POW. These articles were published in Towards Truth and Peace and in other camp publications. In these articles he urged that the United States should cease fighting, declared that the United States used germ warfare and committed atrocities, and stated that the Chinese were good friends. He delivered speeches to groups of POW's to the effect that he and a committee had read confessions of American Air Force officers as to the use of bacteriological warfare and that he (Griggs) believed the confessions. He wrote letters to various groups and individuals in the United States urging them to write to the Government requesting peace. He uttered pro-communist and anti-American state-

ments, e. g., that the United States was the aggressor, a warmonger, that American capitalists in control of the Government started the Korean war, that if he were given a weapon he would fight the United Nations forces, that the United States used germ warfare, that the study of communism was beginning to make sense to him, that he believed in communism, that the Chinese were right in embracing communism, that when he returned to the United States it would be communistic and he would be a hero, that the whole world would be dominated by communism in ten years and that individuals similar to him would be leaders, that he would join the communist party when he returned to the United States, that he would sell out the United States for a tailor-made cigarette.

29. Plaintiff Griggs consorted with the Chinese in the prisoner of war camp, attended enemy parties, visited Chinese headquarters frequently, walked and talked with enemy officers and interpreters, and called or referred to the Chinese as "comrades". He was accorded special privileges in that he received better food, drink, medical treatment, had freedom of the camp and did not have to go out on work details.

30. The Korean armistice was signed July 27, 1953, and prisoner repatriation began August 5, 1953, at Panmunjon. Plaintiff refused repatriation and voluntarily elected to go to communist China. He signed letters prepared by the Chinese addressed to the families of Edward Dickenson and Claude Dickenson. In these letters plaintiff declared the imprisonment of these two men was unjust. He attended a communist indoctrination school at Taiyuan, China, for six months. He was assigned to a state farm in the Yellow River Valley, China, and later was transferred to a factory at Kaifeng until his return to the United States. On January 23, 1954, plaintiff Griggs was dishonorably discharged from the United States Army. He returned to the United States in July 1955. On his return he stated that he returned to the United States because China was a slave

state and because having a job, going to school, taking vacations and having a family and hobbies were practically out of reach in China.

### General

31. With reference to the plaintiffs' assertions while confined as POW's that the United States engaged in germ warfare in Korea, as related in findings 7, 11, 12, 19, 20, 27 and 28, supra, at trial the plaintiffs' counsel stipulated that neither the United States nor any of the United Nations forces engaged in germ warfare in Korea. The defendant produced as witnesses certain Army staff officers who testified authoritatively that the United States did not authorize the use of germ warfare in Korea, did not ship any materials or equipment to Korea for that purpose, and received no requests for such materials or equipment, although the defendant conceded that at all relevant times the United States possessed in the United States a military potential to wage germ warfare. In view of the concession by plaintiff's counsel that the United States did not use germ warfare in Korea, the commissioner sustained plaintiffs' objection to the defendant's testimony but permitted it to remain in the record as defendant's offer of proof under Rule 41(c). The plaintiffs endeavored, without success and only through the medium of cross-examining defendant's witnesses, to establish that they originally had reasonable grounds to believe that their statements as to germ warfare while POW's were true when made.

32. With reference to plaintiff Bell's statement to the Chinese that American troops had injected poison gas into the blood of communist POW's on a ship (finding 14, supra), plaintiffs' counsel stipulated at trial that this had not been done.

33. With reference to the plaintiffs' assertions while confined as POW's that conditions in the POW camps in North Korea where captured Americans and their allies were confined were good, plaintiffs' counsel stipulated that such conditions were not good. The defendant established by affirmative proof that conditions in the communist POW camps in North Korea were so grossly inadequate as to food, clothing, sanitation, shelter, and medical care that the death rate of POW's was nearly 40 percent in certain camps.

### Damages

34. After each plaintiff was captured and before each plaintiff refused repatriation and elected to go to communist China, the Department of the Army took routine administrative action to reflect a change in each plaintiff's records to show them as Corporals as of May 1, 1953. None of the plaintiffs has received any pay for the period from the date he was captured to January 23, 1954, the date each was dishonorably discharged, except amounts advanced by the Army for insurance and allotments for the dependents of each plaintiff. It was stipulated by the parties that, if this court decides that the plaintiffs, or any of them, are entitled to recover as a matter of law, the net amount of damage suffered by each plaintiff by reason of the allegations in the petition is as follows:

Otho G. Bell........ $1,455.29
William A. Cowart.. 4,991.13
Lewie W. Griggs.... 2,810.14

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition therefore is dismissed.

The court further concludes as a matter of law that the defendant is not entitled to recover of and from the plaintiffs on its counterclaims, and the counterclaims are therefore dismissed.