Nott, J.,
delivered the opinion of the Court.
This is an action to recover the pay and rations of a quarter-gunner in the naval service for the period of five years and nineteen days, amounting to the sum of $1,553 40. It is somewhat remarkable as a historical case; and, inasmuch as the statute upon which it is founded was re-enacted in the act of 1862 “for the better government of the navy,” (12 Stat. L., GOO,) leaving the law now precisely as it was when this cause of action arose, we deem it a somewhat important case.
In February, 1807, John Straughan, a citizen of the United States and native of Queen Anne’s county, Maryland, enlisted in the naval service for one year as a seaman on board of the Chesapeake, a thirty-six-gun frigate of tho United States. On the 22d June, 1807, the Chesapeake sailed from Hampton Roads. A British squadron at that time lay at Lynn Haven, blockading some French frigates which were at Annapolis. As the Chesapeake passed out, signals were observed to be exchanged by the British vessels, and the Leopard, a man-of-war, carrying fifty-six guns, passed out in advance of the Chesapeake. *325 About three o’clock in tbe afternoon, both vessels having an offing of eight miles, the Leopard came down on the weather-quarter of the Chesapeake and sent a despatch on board. This despatch contained an order from Vice-Admiral Berkeley, commanding the British naval forces on the coast of North America, dated June 1, 1S07. It recited that certain deserters from the British naval service were then on board the United States frigate Chesapeake, whom the American authorities had refused to give up, and it concluded thus :
“ The captains and commanders of his Majesty’s ships and vessels under my command arc therefore hereby required and directed, in case of meeting with the American frigate Chesapeake at sea, and without the limits of the United States, to show to the captain of her this order, and to require to search his ship for the deserters from the before-mentioned ships, and to proceed and search for the same.”
Accompanying the order of the vice-admiral was a note from Captain Humphreys, the commander of the Leopard, in which he said:
“ The captain of the Leopard will not presume to say anything in addition to what the commander-in-chief has stated, more than to express a hope that every circumstance respecting them may be adjusted in a manner that the harmony subsisting between the two countries may remain undisturbed.”
Commodore Barron replied that he knew of no such men as were described, and that he was “ instructed never to permit the crew of any ship” that he commanded “ to be mustered by any other than their own officers.” He added: “It is my disposition to preserve harmony, and I hope this answer to your despatch may prove satis - factory.” (Id., p. 18.)
The British officer who brought the despatch returned to his ship, and in a few moments, and without further communication, the Leopard opened fire. The Chesapeake endeavored to reply, but her armament was found to be in a disgraceful condition, and unfit for immediate service. The Leopard continued for about twenty minutes to fire deliberately on the unresisting ship, and then Commodore Barron ordered his colors to be struck. As the flag was coming down, Lieutenant Allen seized an ember in his hand and fired the only shot discharged at the Leopard. (2 Cooper, Nav. Hist., 104.)
An officer was then sent by Commodore Barron to the commander of the Leopard to say that he “ considered the Chesapeake her prize.” (3d Am. State Papers, p. 18.)
“ To this message,” says Commodore Barron in his official report, (Id., p. 18,) “ I received no answer. The Leopard’s boat soon after *326 came on board, and the officer who came in her demanded the muster-hook. I replied, the ship and books were theirs, and if he expected to see the men he must find them. They called on the purser, who delivered his book; and the men were examined, and the three men demanded at Washington and one man more were taken away. On their departure from the ship I wrote the commander of the Leopard the enclosed.”
The note referred to was as follows : “I consider the frigate Chesapeake your prize, and am ready to deliver her to any officer authorized to receive her. By the return of the boat I shall expect your answer.”
Captain Humphreys replied : “ Having to- the utmost of my power fulfilled the instructions of my commander-in-chief, I have nothing more to desire.” He then made offers of assistance, and expressed regret that lives should have been lost “ in the execution of a service which might have been adjusted more amicably.”
The loss on the Chesapeake consisted of three men killed, eighteen wounded, and four captured. The four men captured were all American citizens, (Id,, p. 6, 13,) who had been taken forcibly from British merchantmen and impressed on British men-of-war, and on this was founded the pretence that they wore deserters.
The affair immediately became the subject of diplomatic negotiation. Nearly two years after it had occurred, (April 17, 1809,) Mr. Erskine, the British minister at Washington, offered to the United States, as a final adjustment, that, in addition to the disavowal of the act and the recall of Admiral Berkeley, Great Britain should “ restore the men forcibly taken out of the Chesapeake,” and if acceptable to the American government, “make a suitable provisionfortheunfortunatesvfferers.” (Id., p. 295.) But this offer, when accepted by the United States, was disavowed by Great Britain. Two years later, however, (November 1, 1811,) the British government “ authorized” its minister at Washington, “ in addition to that disavowal” of the act of Admiral Berkeley, “ the immediate restoration, as far as circumstances will admit, of the men who, in consequence of Admiral Berkeley's orders, were forcibly taken out of the Chesapeake,” and also “ a suitable pecuniary provision for the sufferers in consequence of the attack on the Chesapeake, including the families of those seamen who unfortunately fell in the action.” (Id., 499.) This offer was accepted by the United States November 12, 1811. (Id., 500.)
Of the four men taken from the Chesapeake, two were returned to her deck in the harbor of Boston on the 11th of July, 1812, one died in captivity, and one was hung as a deserter. (2 Cooper, Nav. Hist., *327 111.) The provision offered by Great Britain for the “sufferers” seems never to have been received, or made the subject of further correspondence. One of the men who were returned was John Straughan, and the claimant is his widow'.
The court of inquiry which investigated the case of the Chesapeake, after censuring Commodore Barron arid certain of his officers, made the following finding: “28. The court is of opinion that the conduct of all the other officers of the ship, except those whose duty it toas to have remedied the deficiencies before stated, and of the creio generally, was proper, commendable, and honorable.” (Id., p. 23.)
A case thus founded upon the fidelity and duty of a sailor in our naval service commends itself very strongly to the justice of the law, and the majority of the court would feel little hesitation in directing judgment were it not for an adverse opinion rendered by the Hon. Beverdy Johnson, then Attorney General, (5 Attorney General’s Opinions, 185,) of which the following paragraph contains the principal and controlling reason:
“ The construction I give to the word enemy in that section of the act is, that it means public enemy. Throughout, in all its analogous provisions, the act contemplates such an enemy, and not mere individual hostility. It looks in these provisions to a state of public war, and not of private outrage. It is, no doubt, true that war may exist without a formal declaration. An assault previously authorized, or afterwards recognized and sanctioned, is war, and creates a belligerent relation between the parties. But a mere individual wrong, neither sanctioned before nor after by the government of the wrongdoer, but, on the contrary, repudiated and properly atoned for, is not war, nor creates any such relation. It is but a private wrong, leaving altogether unaffected the antecedent amicable relations of the two countries.”
The statute referred to by the Attorney General, and upon which the claimant founds this claim, is the act of April 23, 1800, “for the better government of the navy of the United States,” the fourth section of -which enacts “ that all the pay and emoluments of such officers and men of any of the ships or vessels of the United States taken by an enemy, who shall appear by the sentence of a court-martial or otherwise to have done their utmost to preserve and defend their ship or vessel, and, after the taking thereof, have behaved themselves obediently to their superiors, agreeably to the discipline of the navy, shall go on, and be paid them until their death, exchange, or discharge.” (2 Stat. L., p. 45.)
This finding of the court of inquiry shows a sufficient compliance *328 with the conditions of this act, and leads to the conclusion that if the Chesapeake was taken by an enemy the claimant has established her case, and is entitled to the benefit of the enactment.
It seems to the majority of the court, notwithstanding the ingenious argument of the Attorney General, that a ship-of-war which fires into the vessel of another nation, which kills and wounds her men, which compels her to haul down her flag and give herself up as a prize, which takes possession of her decks with an armed force and carries off a portion of her crew as prisoners, is, for the time being, an enemy. The relations of war vessels of different nationalities fall but into two classes —those of enemies, and those of friends; and if the acts of the Leopard were not those of an enemy, then we must pronounce them those of a friend.
But it is urged that these acts were not those of the British government, but the individual acts of the captain of the Leopard. The acts of a naval commander, so far as other nations are concerned, are the acts of his government. His government is responsible for them, must answer for them, and must atone for them. There is no book or decision which calls such acts a private wrong, and the officer a wrongdoer, or which interposes the common law rule that a principal shall not be held for the tortious acts of his agent. Neither the United States nor their injured seamen could have prosecuted the captain and crew of the Leopard in criminal tribunals, nor have recovered damages from them in courts of law. A man who thus fires into another vessel on the high seas, if he acts without a commission, is a pirate, an outlaw from all nations, and liable to be hunted down and destroyed by any. But if he acts under a commission, then redress can be sought only of the government which commissioned him, and which, by commissioning him, assumed a responsibility that can never be laid down, at pleasure. But all doubts of governmental responsibility in this particular case are removed by the fact that the British government received the prisoners taken from the Chesapeake, at first refused to restore them, and, finally, only released them after five years of diplomatic negotiation. We think, therefore, that we must lay aside the idea of this being “but a private wrong” or “individual hostility,” and treat it as the thing it was, the unintended hostile act of a foreign power.
But it is said that a state of war was necessary to constitute the offending party an “enemy,” and this act was not war, but a tort. There is no such thing as a tort by a government against an individual. As between a citizen and his own government, acts which between *329 private persons would be torts are to be deemed implied contracts founded on the right of eminent domain, or else acts unavoidable, and necessary for the public welfare, but never acts founded upon a wrongful or malicious intent. As between a citizen and a foreign government such acts are national, for a nation can injure a nation only through its citizens. “Between nation and nation all rights and pretensions,” says Yatfcel, (p. 351,) “affect the body of the society, together with all its members.” Therefore, the attack of the British frigate was not a wrongful act committed upon John Straughan and his companions, hut a national affront upon the sovereignty of the United States.
When a ship-ef-war deliberately fires upon the flag of another government, it is an act of war. Such acts the comity of nations allows the offending government to disavow and atone for. ' But no mere disavowal relieves it from responsibility. The disavowal only enters into and forms a part of the reparation offered to the injured government. If my servant wilfully drives my horse against a -foot passenger and I disavow the act, I cannot be held to answer for it, and the law adjudges the agent alone responsible for the tort. But the rule forms no part of the law of nations. There the principal alone is responsible; and it remains with the nation that has received the injury to determine whether the reparation is sufficient, or whether the affront shall be taken as a cause as well as an act of war. Thus in this very case of the Chesapeake Mr. Canning, who was the minister representing the British government, as well as an authority on international law, says in his communication of September 23, 1807, to Mr. Monroe, (3 Am. State Papers, p. 200,) “undoubtedly the attack upon a national ship-of-war is an act of hostility” “An act of hostility” offered by one government to another constitutes that government, in the opinion of this court, pro hac vice a public enemy.
This statute of 1800 was not an act to secure gallant conduct in action, but was an act for the general government of the navy, at all times, under all circumstances, and in both war' and peace. The section immediately preceding the one which has caused these doubts provides for those “ cases where the crews of the ships or vessels of the United States shall he separated from their vessels by the latter being wrecked, lost, or destroyed.” It does not relate to acts of violence, for it does not require that the men shall “ defend their ship,” as the fourth section does, but that they shall do “ their utmost to preserve her.” “ Wrecked,” “lost,” and “destroyed,” are terms intended to include cases of marine casualty and disaster, and the two sections *330 taken together were intended to include all cases where our sailors' might he “separatedfrom their vessels” by either wreck or capture.
The first statute relating to the navy of the United States is that of 1794, entitled “An act to provide a naval armament.” (1 Stat. L., p. 350.) It authorizes the President to fix the pay of seamen, but is silent as to their government and discipline. During the Revolution there had been “battalions of marines,” “private ships-of-war,” and a “naval armament” of thirteen ships. There had also been “rules and orders for the navy of the United Colonies,” (November 28, 1775,) and these were adopted, for the government of the navy, by the act of July 1, 1797. (1 Stat. L., p. 523.) The first statute providing, in terms, for our naval discipline is the “act for the government of the navy of the United States,” of March 2, 1799. (.1 Stat. L., p. 709.)
The fourth section of that act is almost identical with the statute we are considering. In the former the phrase stands, “ such officers and seamen of any of the ships of the United States as are taken by the enemy; ” in the latter, it is changed to “an enemy.” If we were construing the act of 1799, it might be doubtful what construction we should give to it; for there is a certain and definitive meaning in the phrase “the enemy.” It is a familiar phrase and means the public enemy, the acknowledged enemy, the enemy of the nation, the enemy with whom we are already at war. But when Congress, in 1800, changed the phraseology, and for this definitive and restricted phrase adopted one so general and comprehensive as to include any and every enemy, they must have done so for some legislative purpose. That purpose appears to us to have been to provide for engagements with pirates, then common in American seas, and to provide for just such cases as this of the Chesapeake.
If, with respect to this particular case, we were to turn to the rule prevailingún the merchant service, we should find that the claim would be to some extent sustained. There are two maxims concerning seamen’s wages that control in courts of admiralty, and they are, first, that freight is the mother of wages; and second, that the seamen’s wages are nailed to the last plank of the ship and to the last fragment of the freight. (Pitman v. Hooper, 3 Sum., p. 50.) And it has been held that where the seamen were released after six months’ imprisonment, and concluded their voyage, the capture did not put an end to the contract of a mariner for wages even during the time of such detention and imprisonment. (Beale v. Thompson, 4 East., 546.) In the case of capture and recapture, the English admiralty courts uniformly have *331 held that the seamen make their wages. The American courts have gone still further in protecting the seaman. Thus, in the case of Brooks v. Dorr, (Mass. R., 39,) it appeared that an American ship was captured by a French privateer; a£ter eight months of detention she was released; one of her crew Was taken on board of the privateer, carried to France and imprisoned; but subsequently he was discharged and returned home : held, that he was “ entitled to Ms wages until Ms return.” And where a seaman was taken from his ship by the captors and never restored to her, it has been held that although the ship, being recaptured, proceeded on her voyage with a new crew, yet the seaman might recover for the whole voyage, because, as was said by Thompson, Oh. J., (Wetmore v. Henshaw, 12 J. R., 324:) “ It may seem, at first view, unjust that the ship-owners should be compelled to pay wages when no service has been performed; but it would be at least equally hard tigon seamen to deny them their icages when the non-g/erformance of the service was not occasioned by their own fault or misconduct, but by a vis major over which, they could have no control.” And the rule is laid down as broadly in Kent, 3 Com., 192.
Mr. J. S. Tyson for the claimant.
Mr. J. B. Kerk, Deputy Solicitor, for tbe government.
The evidence does not sustain the allegation that Straughan was a quarter-gunner, and we therefore allow to the claimant only seaman’s pay, which was then $12 per month, and one ration valued at twenty cents. This, for five years and nineteea days, amounts to the sum of Si,096, for which judgment will be given.
Loring, J., dissenting.