BELL ET AL. *v.* UNITED STATES.

No. 92.   Argued January 11, 1961.—Decided May 22, 1961.

*Robert E. Hannon* argued the cause and filed a brief for petitioners.

*Acting Assistant Attorney General Leonard* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Doub, Alan S. Rosenthal* and *David L. Rose.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners were enlisted men in the United States Army who were captured during the hostilities in Korea in 1950 and 1951. In the prison camps to which they were taken they behaved with utter disloyalty to their comrades and to their country. After the Korean Armistice in the summer of 1953 they refused repatriation and went to Communist China. They were formally discharged from the Army in 1954. In 1955 they returned to the United States. Later that year they filed claims with the Department of the Army for accrued pay and allowances. When these claims were denied they brought the present action in the Court of Claims for pay and allowances from the time of their capture to the date of

their discharge from the Army.[1]  The Court of Claims decided against them, stating that "[n]either the light of reason nor the logic of analysis of the undisputed facts of record can possibly justify the granting of a judgment favorable to these plaintiffs." 181 F. Supp. 668, 674. Judge Madden dissented.[2]  We granted certiorari to consider a seemingly important statutory question with respect to military pay. 363 U. S. 837.

The Court of Claims made detailed findings of fact with respect to the petitioners' conduct as prisoners of war, based upon a stipulation filed by the parties.[3]  These cir-

---

[1] Each of the petitioners was dishonorably discharged by administrative order of the Secretary of the Army on January 23, 1954. The validity of these administrative discharges is not in issue here, since the petitioners have made no claim for pay and allowances after that date. Compare memorandum to the Chief of Staff from the Judge Advocate General of February 3, 1954, J. A. G. A. 1954/1627, with Opinion Memorandum for the Secretary of Defense from the General Counsel of the Department of Defense of January 25, 1954. See Pasley, Sentence First—Verdict Afterwards: Dishonorable Discharges Without Trial by Court-Martial? 41 Cornell L. Q. 545; Note, Misconduct in the Prison Camp: A Survey of the Law and an Analysis of the Korean Cases, 56 Col. L. Rev. 709, 735.

[2] Judge Madden stated:

"It is noteworthy that after Congress abolished the historical power of courts-martial to forfeit accrued pay, the Army, apparently for the first time in history, forfeited the pay already accrued to these plaintiffs, not by the process of trial and sentence, which was forbidden by statute, but by the crude and primitive method of refusing to give them their money. Finding nothing in the law books to justify its refusal to pay these men, it threw the books away and just refused to pay them. It could have set before these confused young men a better example of government by law." 181 F. Supp., at 675.

[3] The petitioners did not stipulate that these facts were true, but did agree "that the facts hereinafter set forth shall, for the purposes of this case, be deemed to have been elicited from defendant's witnesses testifying under oath," and that "[t]he facts so elicited, and hereinafter set forth, have not been rebutted by plaintiffs or by

cumstances need not be set out in minute detail. They are adequately summarized in the opinion of the Court of Claims, as follows:

"[D]uring the period of their confinement each of the three plaintiffs became monitors for the 'forced study groups,' the sessions of which the prisoners were compelled to attend. Armed guards attended these sessions. The programs included lectures picturing what were declared to be the bad aspects of life in the United States as contrasted with idyllic life under communism. As monitors, they procured and distributed propaganda literature, and threatened to turn in names of any prisoners who refused to read and discuss favorably these propaganda handouts.

"Each of the plaintiffs made tape recordings which were used as broadcasts and over the camp public address system. Each of them wore Chinese uniforms and were permitted to attend meetings outside the camp. The details of the plaintiffs' consorting, fraternizing and cooperating with their captors and the devious ways in which they sought favors for themselves, thus causing hardship and suffering to the other prisoners, are set out in our findings . . . .

"Two of Bell's recordings were broadcast over the Peiping radio, stating among other things that on the orders of his platoon leader, his men had killed North Korean prisoners of war, and that President Truman was a warmonger. In written articles for the camp newspaper he alleged that American troops had committed atrocities and he personally had been ordered to kill women and children and not to take

plaintiffs' witnesses, and plaintiffs, and each of them, hereby waive the right to testify or to call witnesses to testify in rebuttal of these facts."

prisoners of war, and that if given the opportunity he would run a tank over the President's body.

"Bell was paid money to write these articles. He also delivered lectures before his company and to the camp on American aggression. He appeared voluntarily in a motion picture and appeared in bi-monthly plays. He stated that if given a weapon he would fight against the United States. He sold food intended for the sick to other prisoners of war. By making reports to the Chinese, he caused one man to be bayonetted and others to be placed in solitary confinement.

"Cowart did many similar things, wrote propaganda articles accusing American soldiers of atrocities and of using germ warfare. He drew posters and cartoons for the enemy, acted in plays, walked and talked with the Chinese officers, guards and interpreters, lived part of the time at Chinese regimental headquarters, stated he hated America, desired to study in China and to return to the United States in five years to help in the overthrow of the government.

"Griggs did many similar things, attended enemy parties, visited Chinese headquarters frequently, referred to the Chinese as comrades, was accorded special privileges, made broadcasts, signed leaflets, wrote articles accusing the American soldiers of atrocities and declared the United States had used germ warfare."

As stated in their brief, the petitioners "do not admit to the alleged acts of dishonor contained in the Stipulation and the Findings of Fact, but rather demur to them on the grounds that such facts are irrelevant and immaterial in a civil action for military pay provided by statute." The statute upon which the petitioners rely

is an ancient one. It was first enacted in 1814 and has been re-enacted many times. It provides:

"Every noncommissioned officer and private of the Regular Army, and every officer, noncommissioned officer, and private of any militia or volunteer corps in the service of the United States who is captured by the enemy, shall be entitled to receive during his captivity, notwithstanding the expiration of his term of service, the same pay, subsistence, and allowance to which he may be entitled while in the actual service of the United States; but this provision shall not be construed to entitle any prisoner of war of such militia corps to any pay or compensation after the date of his parole, except the traveling expenses allowed by law." 37 U. S. C. § 242.[4]

Although the plain language of this law appears to entitle the petitioners to their Army pay and allowances during their imprisonment in Korea, the Government has urged various grounds upon which we should hold that the provisions of the statute are inapplicable. We have concluded that none of the theories advanced by the Government can serve as a valid basis to circumvent the unambiguous financial obligation which the law imposes.

The Army's refusal to pay the petitioners was based upon an administrative determination that all prisoners of war who had declined repatriation after the Korean Armistice "advocate, or are members of an organization

---

[4] The statute was originally enacted on March 30, 1814, as § 14 of "An Act for the better organizing, paying, and supplying the army of the United States." C. 37, § 14, 3 Stat. 113, 115. The provision next appeared as R. S. § 1288. In the 1952 edition of the Code, it appeared at 10 U. S. C. § 846. Title 10, at that time, dealt with the Army and the Air Force. In the 1958 edition of the Code, the provision was transferred to Title 37, c. 4, which covers basic pay and allowances of military personnel.

which advocates, the overthrow of the United States Government by force or violence." [5]  In refusing to honor the petitioners' claims upon this ground, the Army was apparently relying upon a statute enacted in 1939 which made it unlawful to pay from funds appropriated by any Act of Congress the compensation of "any person employed in any capacity by any agency of the Federal Government" who was a member of "any political party or organization which advocates the overthrow of our constitu-

---

[5] This position was set out in a letter from the Army Chief of Finance to the petitioners' lawyer, rejecting the petitioners' claims. The letter in its entirety read as follows:

"2 October 1956

. . . . .

"Dear Mr. Brown:

"Further reference is made to your inquiries concerning the claims of Otho G. Bell, Lewie W. Griggs, and William A. Cowart.

"I have been advised that the following determinations have been made regarding the status of all United States Army Voluntary Non-Repatriates who elected not to accept repatriation to United States control under the terms of the Korean Armistice Agreement prior to 23 January 1954:

"a. That all Voluntary Non-Repatriates who refused to elect repatriation prior to 23 January 1954, under the terms of the Korean Armistice Agreement have, as demonstrated by their refusal to elect repatriation to the United States and their records as prisoners of war, adopted, adhered to or supported the aims of Communism, one of which is the overthrow of all non-Communist governments, including the Government of the United States, by force or violence.

"b. That all Voluntary Non-Repatriates who refused to elect repatriation prior to 23 January 1954 under the terms of the Korean Armistice Agreement now advocate, or are members of an organization which advocates, the overthrow of the United States Government by force or violence.

"c. That all Voluntary Non-Repatriates who refused to elect repatriation prior to 23 January 1954 under the terms of the Korean Armistice Agreement advocated, or were members of an organization which advocated, during the period from the date of their capture in Korea through the date of their Dishonorable Discharge from the

tional form of government in the United States." [6]  That this statute was the basis of the Army's decision is evident not only in the language employed in rejecting the petitioners' demands, but also in the pleadings filed in the Court of Claims.[7]  We need not, however, now decide the applicability of this statute to members of the Armed Forces, for the reason that the statute was repealed more than a year before the Army relied upon it in refusing to pay the petitioners.[8]

---

Army, the overthrow of the United States Government by force or violence.

"d. That such persons are not entitled to the payment of salary or wages for the period beginning with their respective dates of capture through the date they were given Dishonorable Discharges.

"The claims of Otho G. Bell, Lewie W. Griggs, and William A. Cowart may not, therefore, be favorably considered.

"Sincerely yours,

"[Signed]  H. W. Crandall<br>
"Major General, USA<br>
"Chief of Finance"

[6] "(1) It shall be unlawful for any person employed in any capacity by any agency of the Federal Government, whose compensation, or any part thereof, is paid from funds authorized or appropriated by any Act of Congress, to have membership in any political party or organization which advocates the overthrow of our constitutional form of government in the United States.

"(2) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such person." § 9A of the Act of August 2, 1939, 53 Stat. 1148.

[7] The "Second Affirmative Defense" read in part as follows:

"During the period for which they seek to recover pay and allowances herein, plaintiffs advocated the overthrow of the Government of the United States or were members of a political party or organization which so advocated. Therefore, plaintiffs are not entitled to recover under the provisions of Section 9A of the Act of August 2, 1939 (53 Stat. 1148), as amended . . . ."

[8] August 9, 1955, c. 690, § 4 (2), 69 Stat. 625.

Although this was the only ground ever advanced for the administrative denial of the petitioners' claims, the Government's brief in this Court, for understandable reasons, does not even mention this repealed statute. Instead, the Government now relies upon other grounds to avoid the provisions of 37 U. S. C. § 242. It says that the petitioners violated their obligation of faithful service,[9] and points to the principle of contract law that "one who wilfully commits a material breach of a contract can recover nothing under it. 4 Williston, *Contracts* (1936 ed.) § 1022, pp. 2823–4; 5 Williston, *Contracts* (1936 ed.) § 1477; 5 Corbin, *Contracts* (1951 ed.) § 1127, pp. 564–5, see also *Restatement Contracts,* § 357 (1)(a)."

In accord with this principle, the Government argues that in the Missing Persons Act,[10] a statute first enacted in 1942,[11] Congress provided a statutory basis for denying the petitioners' claims. We do not so construe that statute.

Preliminarily, it is to be observed that common-law rules governing private contracts have no place in the area of military pay. A soldier's entitlement to pay is dependent upon statutory right. In the Armed Forces, as everywhere else, there are good men and rascals, courageous men and cowards, honest men and cheats. If a soldier's conduct falls below a specified level he is subject to discipline, and his punishment may include the forfeiture of future but not of accrued pay.[12] But a soldier

---

[9] "I, . . . . . . . . . . . . . . . . . . . . ., do solemnly swear (or affirm) that I will bear true faith and allegiance to the United States of America; that I will serve them honestly and faithfully against all their enemies whomsoever; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice." 10 U. S. C. § 501.

[10] 50 U. S. C. App. § 1001 *et seq.*

[11] 56 Stat. 143.

[12] See Article 57, Uniform Code of Military Justice, 10 U. S. C. § 857.

who has not received such a punishment from a duly constituted court-martial is entitled to the statutory pay and allowances of his grade and status, however ignoble a soldier he may be.[13]

This basic principle has always been recognized. It has been reflected throughout our history in numerous court decisions and in the opinions of Attorneys General and Judge Advocates General. "Enlistment is a contract; but it is one of those contracts which changes the status; and, where that is changed, no breach of the contract destroys the new status or relieves from the obligations which its existence imposes. . . . By enlistment the citizen becomes a soldier. His relations to the State and the public are changed. He acquires a new status, with correlative rights and duties; and although he may violate his contract obligations, his status as a soldier is unchanged." *In re Grimley*, 137 U. S. 147, 151, 152.

Almost a hundred years ago Attorney General Hoar rendered an opinion to the Secretary of War regarding the right to pay of a Major Herod, who had been "charged with murder, arrested, tried by a court-martial, and sentenced to be hung." The Attorney General stated:

"It was not expressly a part of the sentence that Herod should forfeit his pay from the date of his arrest, and I know of no statute imposing a forfeiture of pay from the date of arrest in a case like

---

[13] Unless he is absent without leave or a deserter, *United States* v. *Landers*, 92 U. S. 77; *Dodge* v. *United States*, 33 Ct. Cl. 28; Dig. Op. JAG Army 265 (1868); Dig. Op. JAG Army 850 (1912); JAGA 1952/5875, 2 Dig. Op. SENT. & PUN. § 35.7; JAGA 1953/1074, 3 Dig. Op. PAY § 21.15; Davis, Military Laws of the United States, p. 371, n. 2 (1897); Winthrop, Military Law and Precedents, pp. 645–646 (2d ed. 1920). But see Comment, Mil. L. Rev., July (1960) (DA Pam 27–100–9, 1 Jul 60), p. 151. And see generally U. S. Army Special Text 27–157, Military Affairs (1955), pp. 1605–1612.

this of Herod's. The sentence that he be hung necessarily implied a dismissal from the service, but not, as it seems to me, the forfeiture of back pay. I can find no authority for the opinion of the Comptroller that, as Herod was withdrawn from actual military service by his arrest made on account of a crime committed by him, on the general principle that pay follows services, he should not be paid for the time he was under arrest. The monthly pay of officers of the Army is prescribed by statute, and so long as a person is an officer of the Army he is entitled to receive the pay belonging to the office, unless he has forfeited it in accordance with the provisions of law, whether he has actually performed military service or not." 13 Op. Atty. Gen. 103, 104.

A similar opinion was rendered by Attorney General Alphonso Taft a few years later. He rejected the theory of the Second Comptroller of the Treasury that "[i]f the man, by his misconduct and necessary withdrawal from service, does not perform his part of the contract, the Government cannot be held to the fulfillment of its part thereof." The Attorney General said:

"The Comptroller has, I think, misconceived the true basis of the right to [military] pay .... In the naval, as in the military service, the right to compensation does not depend upon, nor is it controlled by, 'general principles of law'; it rests upon, and is governed by, certain statutory provisions or regulations made in pursuance thereof, which specially apply to such service. These fix the pay to which officers and men belonging to the Navy are entitled; and the rule to be deduced therefrom is that both officers and men become entitled to the pay thus fixed so long as they remain in the Navy, whether they *actually* perform service or not, unless their right

thereto is forfeited or lost in some one of the modes prescribed in the provisions or regulations adverted to." 15 Op. Atty. Gen. 175, 176.

This principle has received consistent recognition in the Court of Claims. "It would, we think, be an anomalous proceeding to permit resort to the courts to ascertain whether, under all the various provisions with respect to pay and allowances of officers and men of the Army, Navy, and Marine Corps, investigations should obtain to determine as a matter of fact whether the soldier involved had by conscientious service earned what the statutes allow him." *White* v. *United States,* 72 Ct. Cl. 459, 468. "[T]he mere fact that an officer or soldier is under charges does not deprive him of his pay and allowances, . . . such forfeiture can only be imposed by the sentence of a lawful court-martial." *Walsh* v. *United States,* 43 Ct. Cl. 225, 231.[14]

The statute upon which the petitioners rely applies this same principle to a specialized situation. A serviceman captured by the enemy and thus unable to perform his normal duties is nonetheless entitled to his pay. The rule has commanded unquestioned adherence throughout our history, as two cases will suffice to illustrate.

In 1807 a sailor named John Straughan was a member of the crew of the American frigate *Chesapeake.* After that vessel's ill-starred engagement with the British man-of-war *Leopard* off Hampton Roads, Straughan was taken

---

[14] See *Conrad* v. *United States,* 32 Ct. Cl. 139; *Carrington* v. *United States,* 46 Ct. Cl. 279. See also Dig. Op. JAG Army 265 (1868); Dig. Op. JAG Army 850 (1912). The rule cuts both ways, as the case of *Ward* v. *United States,* 158 F. 2d 499, illustrates. There the plaintiff, a yeoman in the Navy, had actually performed the duties of a land title attorney. He sued to recover the reasonable value of his services, less what he had received as a yeoman. The Court of Appeals approved a dismissal of the complaint, with the comment that "[h]is rating fixed his status and his pay." 158 F. 2d, at 502.

aboard the *Leopard* and impressed into service in the British Navy. There he served for five years and nine days before he finally was repatriated. Years later his widow sued for his pay and rations as a member of the United States Navy during the period he had been held by the British. The Court of Claims ruled that, even though we had not been at war in 1807, the *Chesapeake* had nevertheless been "taken by an enemy," and that Straughan's widow was entitled to the United States Navy pay and allowances that had accrued while he was serving with the British. *Straughan* v. *United States,* 1 Ct. Cl. 324.[15]

In October, 1863, a lieutenant in the Union Army named Henry Jones was taken prisoner by Confederate guerrillas near Elk Run, Virginia. Jones was confined in Libby Prison until March 1, 1865, when he was exchanged and returned to the Union lines. Upon his return he found that he had been administratively dismissed from the service in November, 1863, because he had been in disobedience of orders at the time of his capture. When the Army for that reason refused his demand for pay and allowances, he filed suit in the Court of Claims. The court entered judgment in his favor, stating that "[t]he contrary would be to hold that an executive department could annul and defy an act of Congress at its pleasure." *Jones* v. *United States,* 4 Ct. Cl. 197, 203.

It is against this background that we turn to the Government's contention that the Missing Persons Act authorized the Army to refuse to pay the petitioners their statutory pay and allowances in this case. The provisions of the Act which the Government deems pertinent

---

[15] The case was decided under a statute specifically applicable to naval personnel, originally enacted in 1800, 2 Stat. 45, now 37 U. S. C. § 244. See n. 32, *infra.*

are set out in the margin.[16]   Originally enacted in 1942 as temporary legislation,[17] ·the Act was amended and re-enacted several times,[18] and finally was made permanent in 1957.[19]   So far as relevant here, this legislation provides that any person in active service in the Army "who is officially determined to be absent in a status of . . . captured by a hostile force" is entitled to pay and allowances; that "[t]here shall be no entitlement to pay

[16] "§ 1001.   Definitions.

"For the purpose of this Act [sections 1001–1012 and 1013–1016 of this Appendix]—

.          .          .          .          .

"(b) the term 'active service' means active service in the Army, Navy, Marine Corps, and Coast Guard of the United States, including active Federal service performed by personnel of the retired and reserve components of these forces, the Coast and Geodetic Survey, the Public Health Service, and active Federal service performed by the civilian officers and employees defined in paragraph (a)(3) above; . . ."   50 U. S. C. App. § 1001.

"§ 1002.   Missing interned or captive persons.   (a) Continuance of pay and allowances.

"Any person who is in the active service . . . and who is officially determined to be absent in a status of missing, missing in action, interned in a foreign country, captured by a hostile force, beleaguered by a hostile force, or besieged by a hostile force shall, for the period he is officially carried or determined to be in any such status, be entitled to receive or to have credited to his account the same . . . pay [and allowances] . . . to which he was entitled at the beginning of such period of absence or may become entitled thereafter . . . and entitlement to pay and allowances shall terminate upon the date of receipt by the department concerned of evidence that the person is dead or upon the date of death prescribed or determined under provisions of section 5 of this Act [section 1005 of this Appendix].   Such entitlement to pay and allowances shall not terminate upon the expiration of a term of service during absence and, in case of death during absence, shall not terminate earlier than the dates herein prescribed.   There shall be no entitlement to pay and allowances for any period during which such person may be officially determined absent from his post of duty without authority and he shall be

and allowances for any period during which such person may be officially determined absent from his post of duty without authority"; that the Secretary of the Army or his designated subordinate shall have authority to make all determinations necessary in the administration of the Act, and for purposes of the Act determinations so made as to any status dealt with by the Act shall be conclusive.

We are asked first to hold that "[s]ince the Missing Persons Act is later in time, is comprehensive in scope, and includes within its provisions the whole subject mat-

---

indebted to the Government for any payments from amounts credited to his account for such period. . . ." 50 U. S. C. App. § 1002.

"§ 1009. Determinations by department heads or designees; conclusiveness relative to status of personnel, payments, or death.

"(a) The head of the department concerned, or such subordinate as he may designate, shall have authority to make all determinations necessary in the administration of this Act [sections 1001–1012 and 1013–1016 of this Appendix], and for the purposes of this Act [said sections] determinations so made shall be conclusive as to death or finding of death, as to any other status dealt with by this Act [said sections], and as to any essential date including that upon which evidence or information is received in such department or by the head thereof. . . . Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under provisions of this Act [sections 1001–1012 and 1013–1016 of this Appendix], to pay and allowances, including credits and charges in his account, and all such determinations shall be conclusive: . . . When circumstances warrant reconsideration of any determination authorized to be made by this Act [said sections] the head of the department concerned, or such subordinate as he may designate, may change or modify a previous determination. . . ." 50 U. S. C. App. § 1009.

[17] Act of March 7, 1942, 56 Stat. 143.

[18] Act of December 24, 1942, 56 Stat. 1092; Act of July 1, 1944, 58 Stat. 679; § 4 (e) of Selective Service Act of 1948, 62 Stat. 608; Act of July 3, 1952, 66 Stat. 330, 331; Act of April 4, 1953, 67 Stat. 20–21; Act of January 30, 1954, 68 Stat. 7; Act of June 30, 1955, 69 Stat. 238; Act of July 20, 1956, 70 Stat. 595; Act of August 7, 1957, 71 Stat. 341.

[19] Act of August 29, 1957, 71 Stat. 491.

ter of R.S. 1288 [the statute upon which the petitioners rely], any inconsistency or repugnancy between the two statutes should be resolved in favor of the Missing Persons Act." This step having been taken, we are asked to decide that the petitioners, because of their behavior after their capture, were no longer in the "active service in the Army . . . of the United States," and that they were therefore not covered by the Act. It is also suggested, alternatively, that the Secretary of the Army might have determined that each of the petitioners after capture was "absent from his post of duty without authority," and, therefore, not entitled to pay and allowances under the Act. We can find no support for these contentions in the language of the statute, in its legislative history, or in the Secretary's administrative determination.

The Missing Persons Act was a response to unprecedented personnel problems experienced by the Armed Forces in the early months after our entry into the Second World War. Originally proposed by the Navy Department, the legislation was amended on the floor of the House to cover the other services. As the Committee Reports make clear, the primary purpose of the legislation was to alleviate financial hardship suffered by the dependents of servicemen reported as missing.[20]

---

[20] "In general, the purposes of this bill are to provide authorization for the continued payment or credit in the accounts, of the pay and allowances of missing persons for 1 year following the date of commencement of absence from their posts of duty or until such persons have been officially declared dead [In December, 1942, the statute was amended so as to permit a department head to continue personnel in a missing status for an indefinite period. 56 Stat. 1092.]; the continued payment for the same period of the allotments for the support of dependents and for the payment of insurance premiums, and for regular monthly payments to the dependents of missing persons, in the same manner in which allotments are paid, in those instances in which the missing persons had neglected to

To hold that the Missing Persons Act operated to repeal the statute upon which the petitioners rely would be a long step to take, for at least two reasons. In the first place, the record of the hearings of the Senate Committee on Naval Affairs clearly discloses that at the time the Missing Persons Act was being considered, the Committee was made fully aware of the 1814 statute, and manifested no inclination to disturb it.[21] Secondly, it is not entirely accurate to say, as does the Government, that the

provide for their dependents through the medium of allotments, such payments to be deducted from the pay of the missing persons in the same manner in which allotments are paid.

.       .       .       .       .

"The Navy Department advised the committee that many instances have occurred during recent months of personnel having been reported as missing, and in accordance with requests received from disbursing officers carrying the pay accounts, the allotments of such persons were discontinued. Because of stoppage of allotments and the withholding of pay of missing persons, dependents of personnel concerned have experienced great hardships in a large number of cases. The committee are advised that this situation is aggravated by the fact that, so long as a person is declared to be missing and has not been officially declared dead, the 6 months' death gratuity is not payable." H. R. Rep. No. 1680, 77th Cong., 2d Sess., pp. 3, 5.

[21] The Committee was advised by a representative of the Marine Corps as follows: "Section 1288, Revised Statutes (sec. 846, title 10, U. S. Code), provides that noncommissioned officers and privates shall be entitled to receive during their captivity by an enemy, notwithstanding the expiration of their terms of service, the same pay, subsistence, and allowances to which they may be entitled while in the actual service of the United States. This applies only to enlisted personnel, and I know of no such law affecting the pay and allowances of officers and nurses. The proposed legislation would also authorize the crediting, in the account of the individual concerned, of the same pay and allowances received at the time an individual is reported as missing or missing in action until his status is determined by competent authority." Hearings before the Senate Committee on Naval Affairs on H. R. 6446, 77th Cong., 2d Sess., pp. 13–14.

Missing Persons Act is "later in time." After the original passage of that Act in 1942, the statute upon which the petitioners rely was recodified in 1952 and again in 1958.[22]

But the question whether there was a repeal by implication is one that we need not determine here, for it is clear that under either statute the petitioners are entitled to the pay and allowances that accrued during their detention as prisoners of war. The Missing Persons Act unambiguously provides that any person "in the active service . . . officially determined to be absent in a status of . . . captured by a hostile force . . . [is] entitled to receive or to have credited to his account the same . . . pay [and allowances] to which he was entitled at the beginning of such period of absence . . . ." It affirmatively appears on this record that the petitioners were in the active service of the Army, that they were in fact captured by the enemy, and that they were later officially determined to be "absent in a status of . . . captured by a hostile force." The terms of the Missing Persons Act are therefore expressly applicable.

The argument that it was open to the Secretary of the Army to determine that the petitioners in the prison camps to which they were taken were thereafter not "in the active service" cannot survive even cursory analysis. In the Armed Forces the term "active service" has a precise meaning, a meaning not dependent upon individual conduct. 10 U. S. C. § 101.[23] Moreover, the verbal

---

[22] See note 4.

[23] A House Committee Report concerning a proposed amendment to the Act sets forth a letter from the Secretary of the Army clearly showing his understanding that "active service" was employed in the statute as a technical phrase embodying a technical status: "Also, the proposal would amend section 2 of the Missing Persons Act to provide coverage for persons on training duty under certain conditions, in addition to persons on active service." H. R. Rep. No. 2535, 84th Cong., 2d Sess., p. 7. See also H. R. Rep. No. 204, 85th Cong., 1st Sess., p. 8; H. R. Rep. No. 888, 85th Cong., 1st Sess., p. 3; H. R. Rep. No. 2354, 84th Cong., 2d Sess., p. 3; S. Rep. No. 573, 85th

structure of the Act, re-enforced by common sense, clearly leads to the conclusion that "active service" refers to a person's status at the time he became missing. Nothing in the legislative history of the original statute or of its many re-enactments offers support for any other construction. That history simply reflects a continuing purpose to widen the classes of persons to whom the benefactions of the law were to be extended, from the time those persons became missing.[24]

---

Cong., 1st Sess., p. 4; S. Rep. No. 970, 85th Cong., 1st Sess., p. 7; S. Rep. No. 2552, 84th Cong., 2d Sess., p. 3.

[24] For example, when the statute was amended in 1957 to extend coverage to those in "full-time training duty, other full-time duty, or inactive duty training," an Army spokesman testifying before the House Subcommittee expressed the clear view that "active service" referred to the moment the person entered a missing status. "The purpose of that . . . is to insure that people who are in a nonpay status at the time they enter in a missing or missing-in-action status are covered. . . . Under the present wording of the bill it is conceivable that being in a nonpay status at the time that he enters into a missing status his survivors would not be entitled to any pay or allowances. This would insure that they would be entitled to the pay and allowances that he would have had, had he been on active duty at the time that he entered into a missing status." Hearings before Subcommittee No. 1 of the House Committee on Armed Services on H. R. 2404, 85th Cong., 1st Sess., p. 563.

In S. Rep. No. 970, 85th Cong., 1st Sess., the Committee on Armed Services stated: "Coverage would be extended to members of the Reserve components while they are performing full-time training duty, other full-time duty, and inactive duty training with or without pay. Members of the Reserve components entering a missing status while performing duty of the types enumerated would have credited to their pay accounts the same pay and allowances that they would receive if they were performing full-time active duty. Some reservists participate in training without pay, such as week-end proficiency flights in aircraft, and this amendment is intended to treat them as if they were on active duty when they entered a missing status." P. 3. Similar statements may be found in H. R. Rep. No. 2535, 84th Cong., 2d Sess., p. 3, and H. R. Rep. No. 204, 85th Cong., 1st Sess., p. 2. Certainly the thrust of these statements is a primary concern with status at the time the missing status is first entered.

The Government's alternative argument seems, as a matter of statutory construction, equally invalid. The legislative history discloses that the provision denying pay to a person officially determined to have been "absent from his post of duty without authority" was enacted to cover the case of a person found to have been "missing" in the first place only by reason of such unauthorized absence.[25] Moreover, desertion and absence without leave are technically defined offenses. 10 U. S. C. § 885, 10 U. S. C. § 886; see Manual for Courts-Martial, United States, p. 315 (1951). It is open to serious question whether the conduct of the petitioners after their capture could conceivably have been determined to be tantamount either to desertion or absence without leave. See Avins, Law of AWOL, p. 167 (1957); Snedeker, Military Justice under the Uniform Code, p. 562 (1953).

These are questions which we need not, however, pursue. We need not decide in this case that the Secretary of the Army was wholly without power under the statute to determine administratively that the petitioners after their capture were no longer in active service, or that they were absent from their posts of duty. Nor need we finally decide whether either such determination by the Secretary would have been valid as a matter of law. The simple fact is that no such administrative determination has ever been made. The only reason the Army ever advanced for refusing to pay the petitioners was its determination that they had "advocated, or were members of an organization which advocated, . . . the overthrow of the United States Government by force or violence."[26] That determination has now been totally abandoned. The Army has never even purported to determine that the

[25] See H. R. Rep. No. 1680, 77th Cong., 2d Sess., p. 5; Hearings before House Committee on Naval Affairs on H. R. 4405, 78th Cong., 2d Sess., p. 2316.

[26] See note 5, *supra*.

petitioners were not in active service or that they were absent from their posts of duty.[27]   The Army cannot rely upon something that never happened, upon an administrative determination that was never made, even if it be assumed that such a determination would have been permissible under the statute and supported by the facts.[28]

[27] Nor has the Army ever purported to determine that the petitioners were not in "captivity" or "in the actual service of the United States" within the meaning of 37 U. S. C. § 242.

[28] The record of a 1954 hearing before the House Armed Services Committee on a bill to extend the life of the Missing Persons Act indicates that some thought was being given at that time to the possibility of an administrative determination that the petitioners were absent from their posts of duty:

"Mr. Bates. General, what is the pay status of prisoners who have refused repatriation?

"General Powell. Those prisoners, sir, are carried in pay status. In negotiating the armistice we agreed that until this matter was settled they would be carried as prisoners of war.

"Mr. Kilday. When does that stop?

"Mr. Bates. Does that stop next week?

"General Powell. The method of stopping the pay and allowances, allotments and status of military personnel of those 21 prisoners is a matter to be decided by the Secretary of Defense for all services involved.   He has announced no decision.

"Mr. Bates. Aren't they absent without leave?

"General Powell. No, sir.

"Mr. Bates. What is it?

"General Powell. In the armistice agreement, the United States agreed to carry them as prisoners of war until the matter was settled.

"Mr. Bates. I thought there was also an understanding that they would be considered a. w. o. l. as of a certain date?

"General Powell. That is a matter still to be decided by the Secretary of Defense.

"Mr. Bates. Or deserters, you know.

"General Powell. The Secretary of Defense is deciding for all services.

"The Chairman. Call the roll.   It is not necessary to call the roll. There is no objection, is there?

"(Chorus of 'No.')

See *Service* v. *Dulles*, 354 U. S. 363; *Vitarelli* v. *Seaton*, 359 U. S. 535. For these reasons we hold that the petitioners were entitled under the applicable statutes to the pay and allowances that accrued during their detention as prisoners of war.

Throughout these proceedings no distinction has been made between the petitioners' pay rights while they were prisoners and their rights after the Korean Armistice when they voluntarily declined repatriation and went to Communist China. Since both the Army and the Court of Claims denied the petitioners' claims entirely, no sepa-

---

"Mr. Kilday. I would like it understood that they are going to be cut off as soon as you can.

"General Powell. Sir, the Secretary of Defense must make a decision, including phychological [*sic*] factors, individual rights, the law involved, and national policy.

"Mr. Vinson. That is right.

"General Powell. He has not as yet announced such a decision to us.

"Mr. Cunningham. Should the pay and allotments, benefits to the members of the family, ever be cut off?

"The Chairman. Sure.

"Mr. Van Zandt. Oh, yes.

"Mr. Cunningham. Why so? They are not to blame for this.

"Mr. Bishop. No, they are not.

"Mr. Vinson. Well, if a man is absent without leave—

"Mr. Cunningham. A man has children or wife and he is over there in Korea and decided to stay with the Communists. Why should the children be punished?

"The Chairman. Wait, one at a time. The reporter can't get it.

"Mr. Cunningham. I think it is a good question. The pay for the individual: he should never have that, and his citizenship. But here is a woman from Minnesota, goes over there and pleads with her son and went as far as Tokyo. Now that mother needs an allotment as that boy's dependent. Why should she be punished because the boy stayed over there? I think there are a lot of things to be considered; not just emotion.

"Mr. Kilday. That is inherent. When a man is court-martialed—

"The Chairman. Without objection, the bill is favorably reported." Hearings before House Committee on Armed Services on H. R. 7209, 83d Cong., 2d Sess., pp. 3071–3072.

rate consideration was given to the petitioners' status after their release as prisoners of war until the date of their administrative discharges. Nor did the petitioners in this Court address themselves to the question of the petitioners' rights to pay during that interval. Yet, it is evident that the petitioners' status during that period might be governed by considerations different from those which have been discussed. Other statutory provisions and regulations would come into play. Accordingly we express no view as to the petitioners' pay rights for the period between the Korean Armistice and their administrative discharges, leaving that question to be fully canvassed in the Court of Claims, to which in any event this case must be remanded for computation of the judgments.

The disclosure of grave misconduct by numbers of servicemen captured in Korea was a sad aftermath of the hostilities there. The consternation and self-searching which followed upon that disclosure are still fresh in the memories of many thoughtful Americans.[29] The problem is not a new one.[30] Whether the solution to it lies alone

[29] See Report by the Secretary of Defense's Advisory Committee on Prisoners of War (1955).

[30] In 1333 John Culwin was charged with having sworn allegiance to his Scottish captors. 1 Hale, Historia Placitorum Coronæ 167–168 (1736). The earliest reported American case of prisoner of war misconduct appears to be *Respublica* v. *McCarty*, 2 Dall. 86 (Supreme Court of Pennsylvania, 1781). During the Civil War thousands of captives on each side defected to the enemy. See H. R. Rep. No. 45, 40th Cong., 3d Sess., pp. 229, 742–777 (1869); Report by the Secretary of Defense's Advisory Committee on Prisoners of War, p. 51 (1955). Two treason trials grew out of prisoner of war misconduct during World War II. *United States* v. *Provoo,* 124 F. Supp. 185, rev'd, 215 F. 2d 531, second indictment dismissed, 17 F. R. D 183, aff'd, 350 U. S. 857; *United States ex rel. Hirshberg* v. *Malanaphy,* 73 F. Supp. 990, rev'd, 168 F. 2d 503, rev'd *sub nom. United States ex rel. Hirshberg* v. *Cooke,* 336 U. S. 210. More than forty British prisoners of war were brought to trial for misconduct. See note, 56 Col. L. Rev. 709–721 (1956).

in subsequent prosecution and punishment is not for us to inquire.[31]  Congress may someday provide that members of the Army who fail to live up to a specified code of conduct as prisoners of war shall forfeit their pay and allowances.[32]  Today we hold only that the Army did not lawfully impose that sanction in this case.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

[31] Upon their return to the United States in July 1955, the petitioners were confined by the United States Army in San Francisco, California, to await trial by general court-martial for violation of Article 104 of the Uniform Code of Military Justice.  In November of that year they were released from confinement by virtue of writs of habeas corpus issued by a Federal District Court, on the authority of *Toth* v. *Quarles,* 350 U. S. 11.  There have been several court-martial prosecutions growing out of alleged misconduct by Army prisoners of war in Korea.  See *United States* v. *Dickenson,* 17 C. M. R. 438, aff'd, 6 U. S. C. M. A. 438, 20 C. M. R. 154; *United States* v. *Floyd,* 18 C. M. R. 362; *United States* v. *Batchelor,* 19 C. M. R. 452, aff'd, 7 U. S. C. M. A. 354, 22 C. M. R. 144; *United States* v. *Olson,* 20 C. M. R. 461, aff'd; 7 U. S. C. M. A. 460, 22 C. M. R. 250; *United States* v. *Gallagher,* 21 C. M. R. 435; *United States* v. *Bayes,* 22 C. M. R. 487; *United States* v. *Alley,* 8 U. S. C. M. A. 559, 25 C. M. R. 63; *United States* v. *Fleming,* 19 C. M. R. 438.  See the discussion of these cases in Prugh, Justice for All RECAP-K'S, Army Combat Forces Journal, November 1955, p. 15; Note, 56 Col. L. Rev. 709.

[32] A *statute* relating to the right to pay of members of the United States Navy who are taken prisoner does appear to require a standard of conduct after capture:

"The pay and emoluments of the officers and men of any vessel of the United States taken by an enemy who shall appear, by the sentence of a court-martial or otherwise, to have done their utmost to preserve and defend their vessel, and, after the taking thereof, to have behaved themselves agreeably to the discipline of the Navy, shall go on and be paid to them until their exchange, discharge, or death."  37 U. S. C. § 244.

No reported case has been found holding that this standard of conduct was not met.  Cf. *Straughan* v. *United States,* 1 Ct. Cl. 324, discussed in text, *supra,* p. 404.