William T. LAWRIE

v.

The UNITED STATES.

No. 373–78.

United States Court of Claims.

April 22, 1981.

E. Michele Moquin, Seattle, Wash., attorney of record, for plaintiff; Jones, Grey & Bayley, Seattle, Wash., of counsel.

Mary S. Mitchelson, with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This case is before this court on cross motions for summary judgment. The parties agree there is no genuine issue as to any material fact. The case was argued

before this court during the week this panel sat and heard cases in Seattle, Washington. We hold in favor of defendant.

Plaintiff was a member of the Naval Reserve on active duty with the Naval Judge Advocate General's (JAG) Corps from October 9, 1970, until his release on July 21, 1976. He was ordered to report to the Naval Shipyard, Puget Sound, Bremerton, Washington, in the spring of 1973, where he remained until his release. While at the Puget Sound Shipyard, the Navy granted two requests of plaintiff that he be allowed to remain on active duty in that duty station for additional 1-year periods. Consequently, the first extended his active duty from June 1974 until June 1975 and the second extended his active duty from June 1975 to July 1976.

In January 1976, plaintiff was sent Bureau of Personnel (BUPERS) Order 169364, which provided that he would be released from active duty the following July (the scheduled expiration of his active duty as extended).

In response, plaintiff requested:

* * * that I be extended on active duty at my present duty station in my present status until 1 October 1976. It is further requested that I be transferred on 1 October 1976 (FY 77) to the Naval Submarine Base, Bangor, Washington, for a full tour of duty as Staff Judge Advocate to the Commanding Officer of that installation or to a billet of similar responsibility at the Naval Submarine Base. It is noted that the billet I am requesting is slated for implementation in FY 77.

*     *     *     *     *     *

In the event that the above request cannot be granted, it is requested that [BUPERS Order 169364] be modified to indicate my entitlement to readjustment pay.

The Chief of Naval Personnel disapproved plaintiff's request because there were no current requirements for JAG personnel at Bangor. However, the Chief of Naval Personnel advised plaintiff that if he desired to request assignment to another activity, he should either request an extension or request augmentation and that any request would necessarily be governed by billet availabilities and strength limitations. Regarding plaintiff's request for readjustment pay (in the event his request for transfer to the Naval Submarine Base on October 1, 1976, was not granted), the Chief of Naval Personnel ruled plaintiff was not entitled to such pay under applicable regulations; for an individual volunteering for an additional period of active service contingent upon assignment to a certain type of duty or location is not considered to have volunteered for an additional tour for purposes of entitlement to readjustment pay. Plaintiff then resubmitted his request for voluntary extension beyond July 1976 "without condition as to duty station."

By letter of June 24, 1976, the Chief of Naval Personnel acknowledged plaintiff's request:

*     *     *     *     *     *

It is considered that by [your letter dated June 11, 1976], you are now requesting extension on active duty for a normal duty station tour. Accordingly, present detailing plans are for you to be extended in your present assignment until October 1976, then transferred to Naval Legal Service Office, Washington, D.C., for duty.

In order to effect the above permanent change of station, it is requested that you submit requests to extend your active duty to October 1978 and to cancel [BUPERS Order 169364].

*     *     *     *     *     *

Plaintiff's response to this was to decline the offer to extend and to reiterate his request that BUPERS Order 169364 be corrected to provide him with readjustment pay.

On July 21, 1976, plaintiff was released from active duty. Five days later he filed an Application for Arrears in Pay, claiming entitlement to $15,000 in readjustment pay. He alleged that his offer to extend was only for one normal tour of duty (until July 1978) but that the Chief of Naval Personnel

rejected his offer by a counteroffer of a normal tour plus an additional 3 months. Plaintiff theorized he was under no obligation to accept this counteroffer and that his release from active duty was involuntary.

By letter of August 23, 1976, the Chief of Naval Personnel denied the claim and explained to plaintiff the reasons why he was not entitled to readjustment pay:

> * * * You volunteered for an unconditional extension of active duty. However, when told of the Navy's plans to grant the request, and that cooperation would be required in administratively effecting the proposal, you declined to accept. The act of declining and your decision to be released from active duty were voluntary acts, and the Chief of Naval Personnel has determined that there is no entitlement to readjustment pay in your case.

This decision was sustained by the Commanding Officer, United States Navy Finance Center.

On August 14, 1978, plaintiff filed his petition in this court, requesting $15,000 readjustment pay, interest from the date of denial of his claim, costs, and reasonable attorney's fees.

The parties agree plaintiff has met the statutory requirements that he be a member of a reserve component and have completed 5 years of continuous active duty immediately prior to his release. Both agree the sole question before this court is whether plaintiff's release from active duty on July 21, 1976, was "involuntary" so as to qualify plaintiff for readjustment pay under the provisions of 10 U.S.C. § 687(a) (1976), which provides, in pertinent part:

Except for members covered by subsection (b), a member of a reserve component or a member of the Army or the Air Force without component who is released from active duty involuntarily, or because he was not accepted for an additional tour of active duty for which he volunteered after he had completed a tour of active duty, and who has completed, immediately before his release, at least five years of continuous active duty, is entitled to a readjustment payment * * *.

We conclude under the statute and applicable regulations that plaintiff was not "released from active duty involuntarily, or because he was not accepted for an additional tour of active duty for which he volunteered after he had completed a tour of active duty * * *." Plaintiff, we find, was accepted for an additional tour of active duty but he rejected that tour. Therefore, his subsequent release was voluntary.

The Secretary of the Navy Instruction (SECNAVINST) 1900.7C,[1] promulgated to implement 10 U.S.C. § 687, provides guidance for determining whether a Naval reservist's release from active duty was "involuntary" to qualify him for readjustment pay under the statute. SECNAVINST 1900.7C provides, in pertinent part:

> The term "involuntarily released from active duty" as used in [10 U.S.C. § 687], includes discharge and all other forms of separation from active duty status under conditions wherein the individual, upon or immediately prior to completing a tour of active duty volunteers to remain on active duty for an additional tour but is not accepted * * *.[2]

1. Although originally contending that SECNAVINST 1900.7D is the appropriate instruction to apply, plaintiff seems now to concede the application of SECNAVINST 1900.7C (plaintiff's opening brief, pp. 12–13). In any event, as plaintiff notes, the application of either instruction does not make a material difference in considering his claim for readjustment pay (plaintiff's opening brief, p. 11):

> "The term 'involuntarily released from active duty,' as used in [10 U.S.C. § 687], includes discharge and all other forms of separation from active duty status under conditions

wherein the individual, upon or immediately prior to completing a tour of active duty, volunteers to remain on active duty for an additional tour but is not accepted . . . . (SECNAVINST 1900.7D which superseded SECNAVINST 1900.7C on July 21, 1976.)"

2. The regulation further explains that an individual who volunteers for additional active duty contingent upon assignment of a certain type or location is not considered to have volunteered for an additional tour for the purposes of entitlement to readjustment pay. Defendant concedes that this provision is irrelevant to this

Under the governing statute and regulation, plaintiff is not entitled to readjustment pay unless he can establish that in refusing to accept the additional tour of active duty assigned to him, his subsequent release was "involuntary," *Cf. Mansell v. United States*, 199 Ct.Cl. 796, 802, 468 F.2d 933, 936 (1972) (release prior to scheduled end of active duty for failure to execute extension of original period was involuntary); *Henneberger v. United States*, 185 Ct.Cl. 614, 624, 403 F.2d 237, 242 (1968) (release after conditional request for extension was voluntary).

Plaintiff was assigned an additional tour of active duty. To plaintiff's unconditional request to remain on active duty, the Chief of Naval Personnel replied, in pertinent part:

\* \* \* \* \* \*

It is considered that by [your letter of June 11, 1976], you are now requesting extension on active duty for a normal duty station tour. *Accordingly, present detailing plans are for you to be extended in your present assignment until October 1976, then transferred to Naval Legal Service Office, Washington, D.C., for duty.* [Emphasis supplied.]

In order to effect the above permanent change of station, it is requested that you submit requests to extend your active duty to October 1978 and to cancel [BUPERS Order 169364].

\* \* \* \* \* \*

Rather than accept this assignment and remain on active duty as he had indicated he desired, plaintiff informed the Chief of Naval Personnel that he declined the offer of an additional tour and reiterated his request for readjustment pay. Since plaintiff refused to accept the additional tour he had requested, he was released from active duty on his original release date, July 21, 1976. We find that since plaintiff could have prevented his release by accepting the additional tour, his release was not "involuntary."

litigation, as the Navy stated at the time of plaintiff's request for additional active duty

Plaintiff contends he was under no obligation to accept the additional tour to which the Navy assigned him because the assignment was not a "normal tour" as plaintiff had requested and therefore was a "counteroffer." By labeling his assignment a "counteroffer," plaintiff then asserts he could reject it without abrogating his original unconditional "offer" to remain on active duty. We reject plaintiff's argument because, first, his analogy to contract law is inapposite and, second, his definition of a "normal tour" is unfounded.

We find plaintiff's attempt to impose a commercial "counteroffer" analysis on the area of military pay unpersuasive. As the Supreme Court noted in *Bell v. United States*, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed. 365 (1961):

\* \* \* it is to be observed that common-law rules governing private contracts have no place in the area of military pay. A soldier's entitlement to pay is dependent upon statutory right. \* \* \* [366 U.S. at 401, 81 S.Ct. at 1235.]

The *Bell* case was an action by enlisted men, who had been captured and held captive during the hostilities in Korea, to claim their pay and allowances which had accrued during their captivity. Defendant presented evidence that the *Bell* plaintiffs had behaved with utter disloyalty to their comrades and to their country while in the prison camps and argued that they had violated their obligation of faithful service, pointing to the principle of contract law that one who willfully commits a material breach of a contract can recover nothing under it. As noted, the Supreme Court rejected the argument grounded in common-law contract rules and analyzed the case strictly on statutory grounds. We think plaintiff Lawrie's argument concerning "offers" and "counteroffers" similarly inapposite.

We also cannot agree with plaintiff that the assignment given to him was something other than a "normal tour." Plaintiff argues that

that his request was considered unconditional.

[i]n the absence of any specification by the requesting member to the contrary, a request for an additional *tour* must be deemed to be a request for a discrete period of service at a given assignment, and/or under the command of one commanding officer, similar to the member's experience of "tours" of duty in the past.

Contrary to plaintiff's assumption, the term "tour of duty" is not a rigid or immutable concept. As the affidavits and documents which are a part of the record explain, several factors are considered before establishing a particular tour of duty.

For example, geographical location of the new duty station may influence the tour's duration. Overseas assignments, in particular, may be of long duration. The marital and family status of an officer also impacts. Single officers and officers whose families do not accompany them are generally assigned shorter tours than married officers and officers with accompanying families. Understandably, a factor of prime importance is the overall need of the Navy for a particular officer's services. The Navy attempts to match the officer's qualifications with the present and future demands of the Service. Within the overall calculus, the Navy also considers the desires of each officer.

After plaintiff's unconditional request for extension was so evaluated, the Chief of Naval Personnel determined plaintiff should remain in his then present duty station for 4 months and then serve at the Naval Legal Service Office in Washington, D. C., for 2 years. Plaintiff's only real objection to this assignment is that it is not what he expected. As defendant pointed out in its Answer to Plaintiff's Interrogatory Number 19 (dated January 14, 1980), the recommended shore tour duty length at that time for lieutenants in the JAG Corps, such as plaintiff, was 36 months. Thus, although plaintiff argues that "concepts of fairness should not allow a member of the reserves to be compelled to 'accept' a counterproposal, which increases substantially the period of time over a regular tour of duty for which he volunteers * * *," we find the contention unpersuasive. The tour

assigned to him was actually 8 months shorter than the recommended tour for someone in plaintiff's position. And, in any event, it appears the length of a tour which may be assigned to an individual is not rigid but is only determined after consideration of many variables, including the needs of the Service.

Plaintiff further attempts to characterize his assignment as unusual by pointing out it was different from the manner in which his two previous requests to extend on active duty had been granted. The simple explanation is that plaintiff's previous two requests had been specifically to extend at his then present duty station for 1-year periods. Since the Navy on those two occasions was able to grant his exact requests, the only necessary response was to simply approve his requests. However, in regard to his last request to extend on active duty, plaintiff knew through previous exchanges that his request to remain in his then present duty station would not be granted and that to be eligible for readjustment pay he must make an unconditional request to remain on active duty. Since this last request was unconditional, it contained no specific period for which he wished to extend. Therefore once the Navy evaluated the various factors involved in assigning a tour and determined that his next tour would extend to October 1978, it was necessary for plaintiff to submit a request that so specified. It was also necessary for him to submit a request to cancel the order which had been previously issued that directed he be released from active duty on July 21, 1976. These administrative matters had never been required of plaintiff before because in the past his specific requests had been granted.

Further, plaintiff is correct in his assessment that most of the case law concerning readjustment pay hinges on the question of whether the plaintiff's request for extension was "unconditional" and, therefore, not controlling in this case since that question is not in dispute. However, his reliance on *Mansell v. United States, supra,* is misplaced. In *Mansell* the plaintiff had been released from active duty 8 months prior to the date on which his tour was scheduled to expire because he refused to execute a 1-

year extension of his active duty agreement. This court held that under those circumstances his early release from active duty was involuntary and hence he was eligible for readjustment pay. The court further acknowledged that had plaintiff been allowed to complete his active duty tour the result might have been different (*supra*, 199 Ct.Cl. at 801–802, 468 F.2d at 936). The *Mansell* case does not apply to plaintiff's situation because plaintiff was' not released prior to his scheduled release date. Plaintiff was not penalized in any way for rejecting the assignment given him in response to his request to remain on active duty. His release was merely the result of his decision to reject the additional tour assigned to him because, without an extension, his active duty expired on July 21, 1976.

Therefore, as plaintiff could have extended his active duty, but chose to reject the additional tour assigned to him, his rejection of that tour was voluntary. He cannot now claim he was "involuntarily" released from active duty for purposes of collecting readjustment pay.

Defendant's cross motion for summary judgment is therefore allowed. Plaintiff's motion for summary judgment is denied. Plaintiff's petition is dismissed.