Constance HORNER, Director, Office of
Personnel Management, Petitioner,

v.

Stanley ANDRZJEWSKI, et al.,
Respondents.

Appeal No. 86-644.

United States Court of Appeals,
Federal Circuit.

Jan. 29, 1987.

Hillary A. Stern, of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for petitioner. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Robert A. Reutershan, Attorney, Dept. of Justice, Washington, D.C. Of counsel were W. Scott Burke, General Counsel, Steve Abow, Attorney, Office of the General Counsel, and Michael J. Horowitz, Counsel to the Director, Office of Personnel Management.

Stuart Kirsch, of the American Federation of Government Employees, AFL-CIO, College Park, Georgia, argued for respondent. With him on the brief was Mark Roth, of the American Federation of Government Employees, AFL-CIO, College Park, Georgia.

Marsha Mouyal, of the Merit Systems Protection Board, argued for intervenor MSPB. With her on the brief was Mary L. Jennings, Associate General Counsel for Litigation, Merit Systems Protection Board.

Before BALDWIN,* and NICHOLS,
Senior Circuit Judges, and NIES, Circuit
Judge.

NIES, Circuit Judge.

Petitioner appeals from a decision of the Merit Systems Protection Board holding the emergency exception, 5 C.F.R. § 752.-404(d)(2),[1] to the statutory requirement of thirty days advance written notice and opportunity for reply to any adverse action, 5

---

* The Honorable Phillip B. Baldwin assumed status as Senior Circuit Judge on November 25, 1986, after having participated as an active Circuit Judge in the consideration and decision of this appeal.

1. The regulation, 5 C.F.R. § 752.404(d)(2), reads:

The advance written notice and opportunity to answer are not necessary for furlough without pay due to unforeseeable circumstances, such as sudden breakdowns in equip-

U.S.C. § 7513(b) (1982),[2] is invalid. We reverse that decision and remand for a determination of whether the regulation was properly invoked.

The issue of the validity of the subject regulation arises in this case from events in 1981, when the federal government came perilously close to running out of appropriated funds for its operations. In order to avoid sending home all the government's employees, as has been necessary on a number of occasions, for example, on October 17, 1986, October 4, 1984, and November 23, 1981, Congress resorted to a continuing resolution, H.R.J. Res. 370, Pub.L. No. 97–92, 95 Stat. 1183 (1981). The resolution incorporated by reference parts of a bill, H.R. 4560, 97th Cong., 1st Sess. (1981), which, by itself, was never enacted into law.

The Mine Safety and Health Administration (MSHA) construed the incorporated bill to require it to furlough 139 of its employees, almost at once, without pay and without the 30 days' advance written notice and opportunity to reply required by 5 U.S.C. § 7513(b). The furloughed employees appealed to the Merit Systems Protection Board, which invalidated the emergency exception regulation relied on by MSHA and canceled the furloughs. *Andrzjewski v. Department of Labor*, 24 M.S.P.R. 78 (1984). Both MSHA and the Office of Personnel Management (OPM) petitioned this court for review.

OPM has no right to appeal from a decision by the Merit Systems Protection Board except upon a petition for judicial review pursuant to 5 U.S.C. § 7703(d). The statute requires that the Director of OPM determine "that the Board's decision will have a substantial impact on a civil service law, rule, regulation, or policy directive." The Director of OPM made that determina-

tion in this case, and after considering the merits of OPM's petition, and a number of opposing briefs, this court accepted the appeal. As part of that order, the effect of the board's decision holding the regulation invalid was stayed during the pendency of this appeal.

In an order dated September 5, 1985, granting the petition, this court indicated that the following questions were raised by the appeal:

(1) The Merit Systems Protection Board erred in finding that OPM's emergency furlough regulation, 5 C.F.R. § 752.404(d)(2), which provides for immediate furlough under certain emergency conditions, is inconsistent with 5 U.S.C. § 7513(b), which requires 30 days' notice prior to any furlough;

(2) The board erred in automatically reversing the agency action on the basis of harmful error; and,

(3) The board erred in failing to address the question of whether its decision which reversed the furlough actions in question and ordered that the agency pay the furloughed employees' salaries for a period equal to the required notice, would violate the Antideficiency Act, 31 U.S.C. § 1341.

We find it appropriate to decide the first issue only. For reasons that follow, we decide that the board did err in striking down the regulation, and we, therefore, reverse the board's decision and remand.

I

On September 23, 1981, the House of Representatives took up H.R. 4560, the regular appropriation bill to fund MSHA and other agencies for the fiscal year ending September 30, 1982. MSHA and the other agencies were then functioning under

ment, acts of God, or sudden emergencies requiring immediate curtailment of activities.

**2.** In pertinent part, section 7513(b) reads as follows:

(b) An employee against whom an action is proposed is entitled to—

(1) at least 30 days' advance written notice, unless there is reasonable cause to believe the

employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action;

(2) a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer....

a continuing resolution prior to the one here to be construed. On October 6, 1981, Representative Rousselot moved to amend the bill by adding the following clause:

> *Provided further* That none of the funds appropriated under that paragraph shall be obligated or expended to prescribe, issue, administer, or enforce any standard, rule, regulation, or order under the Federal Mine Safety and Health Act of 1977 with respect to any person engaged in the surface mining of stone, clay, collodial phosphate, sand, or gravel, or with respect to any person engaged in construction activities on the surface area of any coal or other mine.

127 Cong.Rec. 23384 (1981). The motion carried, and Mr. Rousselot's language became part of the bill as it went to the Senate. The Rousselot amendment terminated MSHA's jurisdiction over eighty-five percent of the mines it had until then inspected, and reduced its personnel requirements by fifty-five percent. The purpose of the Rousselot amendment was to resolve a dispute over whether MSHA or the Occupational Safety and Health Administration should inspect certain surface mines. *Id.* It was thought the dangers in surface mines were not great enough to warrant the frequent and rigid inspections required for underground mines.

The bill, as reported, made an appropriation of $155,734,000 for the expenses of MSHA, and Mr. Rousselot neither proposed nor obtained any reduction in that amount despite the drastic curtailment of activities resulting from his amendment.

The bill then went to the Senate whose Committee on Appropriations, on November 9, reported the bill, deleting the amendment and thus restoring authority for the activities Mr. Rousselot sought to eliminate, yet reducing the appropriation to $155,534,000. S.Rep. No. 268, 97th Cong., 1st Sess. (1981). The report shows the Senate committee supportive of continued full MSHA activity. *Id.* at 23.

Congress took no further action on the regular appropriation bill for the year ending September 30, 1982, and to avoid total lapse, Congress resorted to the continuing resolution. Prior continuing resolutions having expired, effective December 15, 1981, Congress adopted and the President approved H.R.J. Res. 370. 127 Cong.Rec. 30868 (1981); 17 Weekly Comp.Pres.Doc. 1374–75 (Dec. 15, 1981).

The report of the House Committee on Appropriations stated that the continuing resolution incorporated the Rousselot amendment, despite the disapproval by the Senate Committee. H.R.Rep. No. 372, 97th Cong., 1st Sess. 6 (1981). The report did not indicate whether the level of MSHA's funding was affected or what the level for the remainder of the fiscal year would be. The report did state that Congress would continue efforts to get regular bills signed into law, and in the event of success, the continuing resolution would "disengage and the individual bill then becomes the funding device." *Id.* at 2. Thus, it was unclear whether the restraints of the Rousselot amendment would be lifted and the authority to make the disputed inspections restored.

> H.R.J. Res. 370 provides in section 101:
> (3) Whenever the amount which would be made available or the authority which would be granted under an Act listed in this subsection [this includes H.R. 4560] as passed the House as of December 15, 1981, is different from that which would be available or granted under such Act as passed by the Senate as of December 15, 1981, the pertinent project or activity shall be continued under the lesser amount or the more restrictive authority. . . .

Other provisions make a report by an appropriations committee, as occurred in the Senate, the same as action by the entire body.[3]

On December 18, 1981, the Acting Administrator of MSHA promptly issued notices to selected employees establishing furloughs without pay, commencing Janu-

---

**3.** The parties assume that the Rousselot amendment, as passed by the House, is a binding part of H.R.J. Res. 370. We need not and do not decide this issue.

ary 3, 1982, and continuing not to exceed 30 days. The notice stated that neither a 30 days' advance notice nor an opportunity for reply to the notice was required because the action was taken pursuant to the emergency furlough provision of 5 C.F.R. § 752.404(d)(2). The agency claimed "unforeseeable circumstances" as an excuse for the procedural lapse. The agency read into the Rousselot amendment a reduction in the appropriation for its expenses to the extent that it would have been expended for wages and salaries of persons who had been engaged in performing the newly prohibited activities. Under the agency's interpretation, employees transferred to non-prohibited activities could be paid, and were, but those not transferred (the respondents herein) could not be paid, even though in fact they too refrained from all prohibited activities.

The furloughed employees appealed, and the MSPB's presiding officials in several of its regional offices reached varying conclusions. The decisions disagreed over the alleged procedural error in dispensing with the 30 days' advance written notice and opportunity to reply. Some presiding officials held the emergency exception regulation contrary to statute, 5 U.S.C. § 7513(b), and thus invalid. Others upheld the emergency exception regulation and its invocation here. Still others held that any error in not giving 30 days' notice was harmless because the notice and opportunity to respond would have been futile in view of the overwhelming nature of the fiscal catastrophe.

The full board granted the petitions for review, consolidated all the cases, and held that the emergency exception regulation was invalid, relying on another decision of the same date which was not part of the consolidation, *Hastie v. Department of Agriculture*, 24 M.S.P.R. 64 (1984). Thus, all employees prevailed.

## II

### Issue

Whether the emergency furlough regulation, 5 C.F.R. § 752.404(d)(2), is valid or invalid.

## III

The board's holding of invalidity of the emergency furlough regulation results from its reading of 5 U.S.C. § 7512 (1982), that a furlough of thirty days *or less* is an adverse action, in conjunction with 5 U.S.C. § 7513(b), which unequivocally requires 30 days' advance written notice for any adverse action. On the other hand, OPM urges that the regulation is lawful, *inter alia*, because of the Antideficiency Act, 31 U.S.C. § 1341 (1982), which prohibits an agency from expending or obligating funds that have not been appropriated.

That there is a tension between these two statutory provisions is readily apparent. Nothing in the legislative history of the Civil Service Reform Act (CSRA) gives specific guidance on resolution of this conflict. Congress did not, for example, say it intended to overrule the long-standing emergency furlough regulation, 5 C.F.R. § 22.2(c) (1944), which had existed since 1944 in the face of a similar notice provision in the Veterans Preference Act. Ch. 287, § 14, 58 Stat. 387, 390 (1944). Nor can we presume Congress was unaware of the continued existence of the regulation in view of the recurrent end of the fiscal year "emergencies." Nor has Congress, as far as can be determined, even considered overruling the emergency furlough regulation despite enacting other amendments to CSRA.

■ As a general rule, a long-standing interpretation of a statute by an agency charged with its administration must be upheld if reasonable. *See Young v. Community Nutrition Institute,* —— U.S. ——, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986). Yet in *Hastie,* the board gave little weight to OPM's long-standing regulation and the failure of Congress to expressly disapprove or otherwise proscribe the emergency exception regulation. The board gave three reasons for doing so:

First, we note that Congress enacted only one exception to the notice and reply

requirements for adverse actions [the crime exception], and, as a general rule of statutory construction, the expression of one exception indicates that no other exceptions apply. *See* 2A C. Sands, Sutherland Statutory Construction §§ 47.11, 47.23 (4th ed. 1973). Second, while the failure of Congress to disapprove of the regulation should be considered, it has generally been recognized that such inaction is a far cry from approval. 1 K. Davis, Administrative Law Treatise § 5.07 at 334–5 (1958). More importantly, it is also generally recognized that although Congressional reenactment of a statute can strengthen a regulation's claim to validity, reenactment cannot save a regulation which contradicts the requirements of the statute itself, as is the case here. *Commissioner of Internal Revenue v. Acker,* 361 U.S. 87, 93, 80 S.Ct. 144, 148, 4 L.Ed.2d 127 (1959).

24 M.S.P.R. at 73–74 (footnote omitted). Each of the board's reasons either is irrelevant to, or begs, the question of whether the statutory language leaves room for OPM's longstanding regulation. In order to resolve that question, we must turn to the policy underlying the statute.

The government argues that the sole purpose behind section 7513(b) is to afford federal employees the opportunity to attempt to persuade the agency that the proposed action should not be taken. From this premise, it follows that the notice and opportunity to reply serve their purpose only when the agency has discretion to take the proposed action. Conversely, where the proposed action is necessitated by unforeseeable circumstances, the rights to notice and opportunity to reply serve no purpose.

Per the government, the board's interpretation converts the rights afforded by section 7513(b) from procedural rights to an entitlement to 30 days' pay. The agency is required to pay its employees during the notice period. 5 C.F.R. § 752.404(d)(1). The government points out, as did the presiding official in *Geyman v. Department of Labor,* No. AT07528210499 (May 19, 1982), that, if the emergency exception is invalidated, "it will be necessary for the agency, in an emergency situation over which it has no control, to pay the employee during the 30–day notice period in order to furlough that same employee for even one day." The government views such a result as inconsistent with the merit principle that the federal workforce should be used efficiently and effectively, 5 U.S.C. § 2301(b)(5), and, further, as "absurd." [4]

The board disagreed with both characterizations. 24 M.S.P.R. at 74–75. The board pointed out that the merit principles are not self-executing and are only "broad, general declarations of legislative policy" which must give way to the "specific statutory language." *Id.* at 75. In the board's view, the invalidation of the regulation would not work an absurd result. Rather, the plain language of the statute furthers what the board viewed as "a mechanism to allocate the risks of adverse financial consequences between the employee and the agency: that is, during the 30 day notice period, the agency will bear the financial consequences of keeping the employee on the rolls, and, thereafter, the employee bears the consequences of a non-pay status during the furlough period." 24 M.S.P.R. at 74–75 (footnote omitted). The board cited no authority for this statutory purpose, and the government urges that such a purpose would conflict with the Antideficiency Act.

**4.** The application of the notice provision to all furloughs would produce anomalous results. To illustrate, a *suspension* of 14 days or less is not subject to the notice requirement. 5 U.S.C. § 7512. In contrast, a *furlough* of 14 days or less, would require notice under MSPB's interpretation. The difference between the two actions is that a suspension is for disciplinary reasons; a furlough for nondisciplinary reasons. Similarly, a "furlough" of 31 days would be deemed a reduction-in-force which, under the statute, requires no notice. While notice is required by regulation, 5 C.F.R. § 351.801, employees need not be *paid* during the 30 days' notice period in an emergency due to lack of work or lack of funds, 5 C.F.R. § 351.807. Since the statutory language can accommodate OPM's interpretation, there exists no reason to require these irrational distinctions.

Given the alternative readings of the statutory purpose proffered by the government and by the board, we would lean toward that of the government. As neither finds support in the legislative history, though, it would be inappropriate to choose either. Both are based on conjecture, nothing more.

Faced with this conundrum, the *Hastie* board reasoned as follows:

> As discussed above, we cannot find that Congress' actions in this regard have no rational basis. Even if we so found, we conclude that it is inappropriate for the Board to sit as a committee for review and to disregard the order of priorities that Congress consciously selected as reflected in the clear language of the statute at 5 U.S.C. § 7513. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978). Under the circumstances of this case, we find that it is incumbent upon the Board to exercise the equivalent of judicial restraint in interpreting the plain language of the statute. *Id.*

24 M.S.P.R. at 75–76.

If we viewed the statutory language in the same vein as the board, we would very likely agree that we should follow the example of the Supreme Court in *Hill* and defer to the plain meaning expressed by Congress. The provisions of sections 7512 and 7513 are, however, not without ambiguity. In *Hastie,* OPM argued that the statutory language was ambiguous. The board rejected that assertion, reasoning as follows:

> In support of its position that the regulation is valid, OPM also contends that Congress intended to require notice and reply rights only for "truly adverse" actions and that furlough actions do not qualify as such because they are triggered by a lack of work or funds in contrast to other adverse actions that involve misconduct and are taken for disciplinary reasons. While we agree that furlough actions taken under 5 U.S.C. § 7513 are a hybrid kind of action in the sense that they have a RIF–like basis and are nevertheless subject to adverse action procedures, we cannot agree that these unique characteristics provide any basis for disregarding the clear language of the statutory provisions which define such furlough actions as adverse actions requiring advance notice. For the forty years that the term "adverse action" has existed in civil service law, it has been recognized as a term of art, and we find that OPM's arguments that these furlough actions are not "truly adverse" plainly disregards this fact. For the above reasons, we conclude that OPM's attempts to redefine these furloughs [*sic*] actions are unpersuasive and that this redefinition has no basis in law.

*Hastie,* 24 M.S.P.R. at 74 (footnote omitted). But what is to the board clear language has not been interpreted as such by OPM. The notice provision of section 7513(b) applies to an adverse action under section 7513(a) which an agency "may take ... only for such cause as will promote the efficiency of the service." If an emergency furlough action is taken because an agency has no choice, rather than for the "efficiency of the service"—as that term is generally understood—it can reasonably be said that the agency did not "take an action" covered by chapter 75. Thus, the notice provision of section 7513(b) would be inapplicable. *See Federal Personnel Manual,* ch. 752 at 752–9 to 752–11 (1980). Conversely, if a furlough action was not properly taken for emergency reasons, then it is an adverse action. This analysis is comparable to that which we have made in other factual contexts, for example, where the issue is the voluntary or involuntary retirement of an employee, as in *Griessenauer v. Department of Energy,* 754 F.2d 361, 364 (Fed.Cir.1985), and *Covington v. Department of Health & Human Services,* 750 F.2d 937, 941 (Fed.Cir. 1984).

■ We agree with the contention of OPM that there exists in the statute an ambiguity. That being the case, there is room for the regulation, which merely resolves that ambiguity. Accordingly, we uphold 5 C.F.R. § 752.404(d)(2).

## IV

The issue of the propriety of use of the emergency furlough regulation is an open question here. For the protection of employees, precipitous action which deprives them of their livelihood must be restricted to *very* narrow circumstances.[5] OPM asserts here that the agency would have violated 31 U.S.C. § 1341 if the agency had kept petitioners on the payroll. If that proposition is correct, it is a legitimate ground for invoking the emergency furlough regulation. An agency need not presume 30 days in advance that Congress will not fund the agency's work in a timely manner. The matter of whether appropriated funds could be spent on employees who did no work was not decided by the board, and we express no opinion on that issue.

## V

For the foregoing reasons, we reverse the decision of the board that 5 C.F.R. § 752.404(d)(2) is invalid. The case is remanded to the board to determine whether the regulation was properly invoked under the circumstances of this case.

REVERSED and REMANDED.

NICHOLS, Senior Circuit Judge, dissenting.

I regret that, with all respect, I am unable to join in the court's opinion, though I find it somewhat persuasive as to the matters it discusses. I deem it improper to render opinions that are advisory in nature, not dealing with genuine issues, but with those which are moot and fictitious.

The remarkable feature of this case is the ready acceptance the MSPB accorded to the agency assertion that the continuing resolution, H.R.J. Res. 370 hit it with an unforeseeable fiscal emergency, to which the furloughing in issue was the only possible response. The impact of H.R.J. Res. 370 on the agency's funding was a question

of law, the decision of which was crucial to the case. The absence of care with which it was actually gone into is illustrated by a fact the court points out, the MSPB's citation of the wrong section of the resolution, one which could not possibly have caused the havoc that ensued. This acceptance of an unsupported, and probably incorrect, legal interpretation is perhaps explained by the fact that the OPM wants to use this case to obtain a holding citable in the very different situation of a total and government-wide lapse of funding, such as has several times occurred as the court points out. So the assertion there was a lapse of funding is accepted uncritically and the desired opinion is obtained. No longer is it necessary to have a true case or controversy if an appellate decision is to be obtained. A careful analysis of the impact of H.R.J. Res. 370 would have disserved, I think, the real purpose of the present appeal.

I was alerted to inquire into the true text, meaning, and effect of the Rousselot amendment by my inability to comprehend how the section of H.R.J. Res. 370 the MSPB quoted could have the effect imputed to it. Legislative historical material concerning continuing resolutions is hard to come by, as law publishers apparently fail to realize they may generate legal problems of continuing importance. With the cooperation of our fine librarian, the material was obtained and it was only necessary to arrive at a legal conclusion whether H.R.J. Res. 370 achieved a relevant cut off of funds. Because the issue was not briefed or argued, however, I think the MSPB should go into it on remand and not consider itself bound by my unaided analysis. The legal conclusions I set forth hereafter are therefore tentative.

It seems obvious to me that if prohibited work was not done, H.R.J. Res. 370 did not cut off any funds. If this is wrong, we are not shown why. The applicability or relevance of the OPM Regulation, 5 C.F.R.

---

5. Our upholding the subject regulation does not conflict with the result in *Cuellar v. United States Postal Service,* 8 MSPB 282, 8 M.S.P.R. 624 (1981). *Cuellar* dealt with an improper *suspension* of an employee during the notice period prior to his removal. *See* 48 Fed.Reg. 19,349 (1983) (OPM's deletion of 5 C.F.R. § 752.404(d)(3) in response to *Cuellar* ).

§ 752.404(d)(2), is unsupported and simply hangs in the air. If it was not applicable to the case, or relevant to the actual case, its validity is not a real issue, but a fictitious or moot one. We ought not to pass on it, notwithstanding its acceptance by our motions panel in its order of September 5, 1985, which could not have had the light we have, and necessarily accepted as correct the parties' statements as to what the issues were. Such an order cannot be read to require decision of a moot case, yet the court seems to impute such an effect to it.

I am not persuaded that the Rousselot amendment did more than prohibit use of funds to perform certain work. If such work ceased, it said nothing as to whether or not employees who had done that work should still be paid. It looks to me as if the full sum appropriated in the continuing resolution remained available until expended for the salaries of such persons, but we have a live issue only as to the lesser amount needed to pay salaries during the running of the 30–day notice period as Congress intended, what might be called going out of business expense. If the above is not so, we are not shown why. Therefore, the alleged fiscal emergency is a myth, and no proper ground for determining the validity of a regulation which, by its own terms, applies only in cases of emergency. My analysis of the legal issues follows in more detail.

### Discussion

### I

In my opinion, the first issue to attack in this case is the nature of restrictions imposed on MSHA by the Rousselot amendment as incorporated by reference in H.R.J. Res. 370. Does it prohibit, not only certain regulatory activities, but also continued pay for a 30–day notice period of those who, but for the amendment, would have been performing the prohibited activities? If it does not, it lends less or no support to the validity of the involved furloughs without pay.

It is wrong, as I will show later, to impute to Congress an intent to repudiate entitlements it has itself created unless that intent plainly appears. Some of the presiding officials were astute enough to perceive this, and examining the House Joint Resolution, failed to discover where it prohibited spending any money, within the overall statutory ceiling, for any reasonable and legally authorized purpose. If the "sudden emergency" is not the amendment, it is nothing.

That amendment, as part of H.R.J. Res. 370, is to be given the same restraining effect, and no more, as it would have had as part of H.R. 4560, had the latter been enacted into law. Its sponsors intended it to achieve no more than that, and it does not gain a different meaning by being taken from its original context and incorporated by reference elsewhere.

Mr. Rousselot, and the Congressmen who voted for his amendment, could not have intended H.R. 4560 to have any immediate effect on the legal right of the persons who had administered the program to be paid for any pay periods. First, they did not express any such intent in the amendment text or elsewhere. Second, the thrust of their effort was to adjudicate an interagency jurisdictional dispute, not to curtail expenditure, which curtailment, if achieved at all, was a by-product. Third, they did not make any move to adjust the $155,734,-000 agency figure downward to take advantage of any saving in payroll to result from their curtailment of the program. Fourth, they must have realized that the effect of their amendment, if it became part of a regular appropriation act such as H.R. 4560 was meant to be, would have been to precipitate moves to dismantle the agency, in whole or in part, including separation of surplus employees, for which substantial money would have been required. For one thing, employees separated without their own fault, and not placed elsewhere, would have been entitled to severance pay, usually for 6 months, a charge on the agency that had employed them. 5 U.S.C. § 5595. Others would have claimed immediate retirement on full annuity. 5

U.S.C. § 8336. For almost all there would be accrued annual leave.

It is a common observation that in the short run in the Federal Government, curtailment of activities with concomitant involuntary separation of employees adds to expenditure instead of reducing it. One who wrongly thought H.R.J. Res. 370 curtailed rights under 5 U.S.C. § 7513(b) would very likely have wrongly thought H.R. 4560 would have curtailed rights under the other statutes mentioned, for example, as to severance pay. I do not think any Congressman of the real world would have intended to attack vested rights in such a manner, and all to no purpose, since the rights in question could have been enforced, even in the absence of appropriation, in the then Court of Claims, and paid out of the open-ended appropriation for paying Court of Claims' judgments. *Ellis v. United States,* 657 F.2d 1178, 228 Cl.Ct. 458 (1981); *Collins v. United States,* 15 Ct.Cl. 22, 35 (1879). The mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a government obligation created by statute. *New York Airways, Inc. v. United States,* 369 F.2d 743, 177 Cl.Ct. 800 (1966). Pay entitlement is for the amount provided for by law, not for the amount appropriated. *French v. United States,* 16 Ct.Cl. 419, 422 (1880). Any intent of Congress to change a substantive obligation by a provision in an appropriation must be manifest. *New York Airways,* 369 F.2d at 749. An employee is not required to remain active or perform services to be entitled to active duty pay during a notice period. *Oliver v. United States Postal Service,* 696 F.2d 1129 (5th Cir.1983). A person's entitlement to pay and allowances is so overriding that even a soldier rendering service to the enemy has been held entitled to his lawful pay and benefits until lawfully terminated. *Bell v. United States,* 366 U.S. 393, 401–02, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961).

The fact that the Rousselot amendment was made part of H.R.J. Res. 370, instead of H.R. 4560, does not, as I have shown,

either loosen or further straiten its prohibitions. The affirmative action it suggests is different insofar as it might seem precipitate to dismantle the agency upon enactment, in view of the statement of the House Committee that work on the regular appropriations would continue and, as they became law, they would preempt the Continuing Resolution. Thus the discordant Senate position might prevail over the Rousselot amendment. The furlough emerges as a reasonable selection among possible actions. Nothing is added, however, to require disregard of employee's entitlements, among which the 30–day notice of section 7513(b) clearly belongs, with pay while the notice is running. The contrary idea seems founded on the erroneous notion that it is illegal to pay employees their wages and fail to assign them work. *See Oliver,* 696 F.2d at 1131. If they couldn't think of anything lawful for employees to do during a 30–day notice period, they might have sent them home on administrative leave, or kept them at their desks working crossword puzzles, in either case with pay continuing. Nothing in H.R.J. Res. 370 added a prohibition that otherwise did not exist. Any prolonged continuance of pay without work would doubtless incur criticism, and possibly impair the reputations of the officials responsible, but I cannot specify when payment would become illegal while the appropriation lasted, and the employment was not lawfully suspended, certainly not during a 30–day notice period required by law. The OPM recognizes the legal propriety of a paid, but nonduty, status during the running of a notice period in 5 C.F.R. § 752.404(b)(3)(v).

## II

The agency relies, however, on another OPM regulation adjacent in the CFR to the one just cited, 5 C.F.R. § 752.404(d)(2), which is set forth above. In *Hastie v. Department of Agriculture,* 24 M.S.P.R. 64 (1984), the MSPB held this regulation to be totally invalid, because in conflict with section 7513(b), as did the MSPB, following *Hastie,* in this case. We should not affirm

on such broad grounds. I do not know to what uses the regulation has been or will be put and they might include invoking it in instances of lapse of appropriations and Continuing Resolutions, though it may be obvious the Congress intends to fund the government and the lapse must soon be ended. That is a situation entirely unlike the one we must deal with here, one where ample appropriated funds apparently are available at least for discontinuance expenditures including employee's pay claims. To hold the regulation wholly invalid in such a case, though no case or controversy concerning it is before us, would be an advisory opinion or else judicial legislation.

In my view, the cited OPM regulation, if valid, yet might not apply to the case before us. Clearly it was not a breakdown of equipment, and an Act of Congress is not normally considered an Act of God. What was "unforeseeable" about it? Storm clouds were visible from MSHA headquarters at least as early as House passage on October 6 of Mr. Rousselot's amendment. Several presiding officials properly pointed this out. By the same token, what was "sudden" about it? Where was the "emergency?"

I think if a funding crisis produced by an Act of Congress is within the regulation at all, it must be one to be taken as a *pro tanto* repeal of section 7513(b) because it makes such an intention clear or makes that section legally or practically impossible to comply with. There is nothing to show this is such a case: the financial means of complying with section 7513(b) were apparently provided.

## III

The Antideficiency Act, 31 U.S.C. § 1341, as now codified, formerly section 665a, prohibits agency officials from making expenditures or incurring obligations in excess of the amounts appropriated for it, or creating contracts or obligations in anticipation of future appropriations. Officials who violate these constraints are threatened with jail terms or fines by section 1350. The agency argued it would incur

section 1350 penalties if it paid furloughed employees for the 30–day notice period, but this argument is based on an interpretation of the Rousselot amendment that I reject. Funds to continue payment during the 30–day notice period were appropriated and available under H.R.J. Res. 370, so long as disapproved work was not done, as it appears to me.

### Conclusion

Our review convinces me that if the MSPB was right, it was for the wrong reasons. The terms of the statute, H.R.J. Res. 370, the Continuing Resolution, cannot be read as the MSPB read them, to cut off funding to pay the respondents in question during a 30–day notice period. The opinion of the MSPB does not reflect that the board correctly identified even the portion of the Continuing Resolution that supposedly achieved such an end. Hence, its further implicit finding that "unforeseeable circumstances" existed to trigger application of the OPM Regulation, 5 C.F.R. § 752.404(d)(2), rests on an apparent misinterpretation of H.R.J. Res. 370. MSPB may have thought, however, and possibly meant to say, that a sudden and drastic reduction in workload sufficed to be "unforeseeable circumstances" under the regulation, and that according to its terms, it was irrelevant that only work was cut off, not funds.

Unless the regulation is determined to control the result if it is valid, the board cannot properly assert it is invalid, as it has done. This court should not consider the validity of the regulation when it is not satisfied that it pertains to the case.

The board does not mention the Antideficiency Act, 31 U.S.C. § 1341, which OPM relies on; however, that Act does not have a bearing if, as it appears to me, funds to pay respondent employees had been appropriated and paying them would not produce a deficiency.

I might have come to the same conclusion as the board respecting the rights of respondent employees, but it would have been on different grounds owing to our

different interpretation of H.R.J. Res. 370. In the circumstances, the appropriate thing to do is not to affirm, but to vacate and remand, and this I would do. I would instruct the board to take testimony by persons knowledgeable about United States Government appropriation, funding, and accounting matters, and ascertain whether the respondent employees could have been paid during the notice period, if not, why not, and if they could have been, whether any other circumstances were "unforeseeable circumstances" or an "emergency" under the regulation. The board should then determine whether the involved OPM Regulation was really relevant to the case at all, and only if it was, whether the regulation was invalid. This court should not pass upon the validity of the regulation as a whole in such an atypical context upon mere speculation that such a determination might be necessary.